## HENRY MILLER v. THE STATE.

### No. 60. Decided March 25.

31 609
32 26
32 635
31 609
34 411
31 609
35 294
35 375
37 474
39 356
39 623

**1. Change of Venue—Practice—Bill of Exceptions.**—In order to entitle the ruling of the court overruling an application for change of venue to be considered and revised on appeal, it is essential, under express provisions of article 584 of the Code of Criminal Procedure, that the facts upon which the order was based be presented in a bill of exceptions prepared, signed, approved, and filed at the term of the court at which such order was made.

**2. Same.**—The rule above stated is in no way obviated nor supplemented by attaching to the application for change of venue a newspaper account of the actions of a mob, which sought to take defendant from custody for the purpose of hanging him.

**3. Continuance.**—An application for continuance for a witness, by whom it was proposed to prove, that a few nights prior to the homicide several policemen were at defendant's house inquiring for him, "and they said they proposed to arrest him, and that he would then be killed by some man who they named to said witness," but neither the name of defendant's proposed slayer nor that of any one of the parties who visited his house was stated in said application: *Held*, that the allegations were too vague and indefinite to be admissible in evidence, and the continuance was properly refused.

**4. Evidence.**—Evidence germane, and tending to maintain the theory of the defense, if it had been offered for that purpose, does not become incompetent because offered by the prosecution.

**5. Practice—Evidence, Withdrawal of, where Improperly Admitted.**—While there may be cases in which the subsequent withdrawal of testimony from the consideration of the jury would not cure the error of its admission, the weight of authority is that it will ordinarily do so, and especially where the evidence is not of such prejudicial character as that the defendant would thereby be deprived of a fair and impartial trial.

**6. Evidence of Malice and Motive.**—On a trial for murder of a policeman, where it appeared that about three weeks before the homicide, defendant, in speaking of his previous arrests by deceased and other policemen, remarked, in substance, that in case of his arrest again, and he was not allowed to give bond, and he had a gun with him, "he'd be damned if the fight didn't begin right there:" *Held*, that the evidence was admissible on the issue of malice and motive.

**7. Res Gestæ.**—Where on a trial for murder the prosecution proposed to prove that within fifteen minutes after the shooting, the defendant, when he was informed of the death of Brewer (deceased), requested some one in the crowd to tell Sam M., his brother, "to come down here; by God, I have got my man," and it was objected that the evidence was inadmissible, defendant at the time being in arrest: *Held*, the testimony was res gestæ, and properly admitted.

**8. Illegal Arrest, Rights of Defendant in Resistance to—Self-Defense.**—Where a party is illegally detained in custody, he may in a proper manner regain his liberty, and a killing under such circumstances may be reduced to manslaughter or self-defense; but if more force than necessary be used, or a deadly weapon be resorted to unnecessarily in the first instance by the arrested party, this would constitute him the aggressor. He may repel force by force to the extent of prevention and defense, but not disproportionate to the

injury.   The right to repel force by force continues until the person attempting the illegal arrest presses forward with such violence that the person defending is obliged to choose between retreat, surrender, or the death of his adversary; and when he resorts to the latter alternative, if the force used by him was disproportionate to the injury, self-defense is eliminated.

9.  Illegal Arrest—Manslaughter.— It has been held, that an illegal arrest is esteemed, in law, a great provocation; but if it be conceded that such provocation constitutes " adequate cause," still in order to reduce the killing to manslaughter " sudden passion" must have existed in the mind of the slayer at time of the homicide, otherwise the killing would be murder.   There must be a concurrence of " adequate cause" and " sudden passion," as defined by our statute, to reduce a felonious homicide to manslaughter.

10.  Same — Unknown Provocation.—If there exists "a provocation" unknown to the accused at the time of the homicide, this would not suffice to reduce the killing below the grade of murder; as, for instance, if the warrant of arrest was illegal, but that fact was unknown to the accused, it is absolutely certain that his " passion," if any, could not have been caused by that provocation.

11.  Murder, Notwithstanding Resistance to Illegal Arrest.— Where a party, expecting an attempt will be made to arrest him illegally, deliberately prepares arms for immediate use, and calmly and deliberately determines to kill the person attempting such arrest, and upon his appearance for that purpose does kill him, such killing would be upon *express malice*, and to hold the slayer guilty upon express malice would not only be law, but common sense and justice.

12.  Charge of the Court.—See a state of facts discussed in the opinion of the court, upon which it was held, that the court properly charged on murder of the first and second degrees, as well as on manslaughter, and properly refused and declined to confine the jury to the questions of manslaughter and self-defense.

13.  Murder of the First Degree.—See facts stated which, in the opinion of the majority of the court, amply sustain a verdict and judgment for murder of the first degree, with the infliction of the death penalty.

Hurt, Presiding Judge, dissenting.

Appeal from the District Court of Dallas.   Tried below before Hon. R. E. Burke.

Appellant was indicted for the murder of one C. O. Brewer, and at his trial was convicted of murder in the first degree, the punishment being assessed by the verdict and judgment at death.   Deceased was a policeman of the city of Dallas, and the defendant a negro who had been arrested by another policeman.

The defendant made application for a change of venue, on the ground, that there exists so great a prejudice against him at this time in Dallas County that he can not obtain a fair and impartial trial, and alleges the existence of a dangerous combination against him in said county, instigated by influential persons, which will defeat a fair and impartial trial; and made a part of said application the printed account of said homicide, the acts of the mob, etc., as shown in the Dallas News and Times-Herald,

papers of wide circulation in Dallas County, in which was detailed the murderous assault by a mob upon the defendant after his arrest, the organization, speeches, and conspiracy of the mob against him in said county.

The defendant also asked for a continuance on account of the absence of Jesse Brown, a material witness in his behalf, a resident of Dallas County, Texas, by whom he expected to prove, that a few nights prior to said alleged homicide several policemen, with others, came to defendant's house in the city of Dallas, and there talked with said Jesse Brown, and inquired of said witness the whereabouts of the defendant, and said they proposed to arrest defendant, and that defendant would then be killed by some man, who they then named to said witness; and that afterwards said witness advised defendant, before said alleged homicide, of the above, and that his life was in danger whenever he should be arrested by the policeman.

Jim Beard, witness for the State, being sworn, testified as follows: I am a policeman in the city of Dallas, and have been for eight years. I know Henry Miller, and I knew Mr. Brewer in his lifetime. I can not say that I was present at the trouble between Miller and Brewer and Brandenberg. I was about the Union Depot on that day, about the time of the difficulty. Brewer, Brandenberg, and I were standing on the edge of the platform on the edge of Elm Street, up there near the depot. I think Brewer asked if Ed (meaning Ed Cornwell) did not want Henry Miller. I told him yes. They remarked, "Yonder he is." I saw Miller then in Lacy's saloon, across the street. I started to go over there and arrest him myself, but as I got into Lacy's saloon he got out some way, and I did not see him. I thought he had gone out at the side door, and I looked up, but I did not see him, and then I saw Brandenberg get him across the street where I had left him, and was coming with him to the saloon. I went in the saloon and telephoned for the hoodlum wagon at the station. I walked back to the door, and Henry Miller asked me if he could give bond. I told him no, that I did not know exactly what the charge against him was, and that Ed Cornwell had told me to bring him down there. I said, "How in the hell did you get out of here, Henry? I came in here to get you myself." I said also, "Go on down there, Henry, and see Ed, and it will be all right." I then went on across Main Street, and just as I got near the Headlight saloon I heard the first shot, and I did not know what it was. When I left the defendant I anticipated no trouble. There was about one shot, and then in a few seconds another shot, and then the firing became general. I do not know how many shots were fired, but there must have been a dozen or more. When I got near the corner, coming back, I saw Brewer near the middle of the street, lying down. I ran up to him and asked him if he was shot, and he said, "I am gone; look after my poor wife and babies." I took him by the arm and started to lift him up, and I snatched hold of his vest and saw the

blood on it, and I let him go, and then I ran up towards Hawkins Street, and there I saw Chief Wilkerson and Mr. Myers, of the fire department, in a buggy, and I told them that I wanted to catch that negro, and asked Myers to drive me. I ran on up to the next street, going down Hawkins Street, and I saw Henry Miller, and I hallooed at him to stop. He looked back and saw who I was, and saw that I had the drop on him, and then he said, "All right, Mr. Jim." I said, "Hand me that pistol." He had the pistol in both hands, with the butt end of it towards me. I walked up to him, and he still held to his pistol with both hands awhile, and I told him to turn it loose or I would kill him, and then he turned it loose. He had a lot of cartridges in his hand also. He was right near a residence there, but I do not know who lived there, but there was a fence right there, and he backed up against the fence. I took Henry Miller.

Mr. Martin was the first man that got to me afterwards, and then the crowd became general. I took the cartridges out of defendant's hand, and then some one put the nippers on him. I started on back down Hawkins Street from Swiss Avenue; there's where we caught him. Well, I turned down Swiss Avenue to Preston Street, but in the meantime some one had struck Henry Miller with a rock. I took six cartridges out of his hand and sixteen out of his pocket, I think it was. His was a Colt's 44 pistol, and I think it shot six times, but of that I am not positive. I left it at the station house. Well, I can get the pistol for you, I think. I left it with the station-keeper. As I said, I arrested Henry Miller, and brought him down Swiss Avenue to Preston Street, and down Preston Street to Elm Street. This was in Dallas County, State of Texas, on the 24th day of May, 1892.

Cross-examined, he said: While standing at the depot platform, I think that Brandenberg or Brewer, one, asked me if Ed Cornwell did not say to arrest Henry Miller. I said, "Yes." They said, "Yonder he is," and I said I would go and get him. I did go over there, and he went out one door while I was going in the other. When I looked over to the platform where I left, I saw Brandenberg coming towards the saloon with him. I think Brandenberg had hold of him. Brewer was coming along with him also. Brandenberg had hold of him by the arm. I don't think they had the nippers on him. I said to him, "How in the hell did you get out of here? I came in here for you, myself." Then he asked me for bond, and I told him that I did not know what he was charged with, but I told him to go down to the city hall and see Ed, and I thought it would be all right. I told him I could not give him bond. Then they walked off, and I started on up towards Main Street, and I did not think there would be any trouble. I had walked about 150 feet, up to where the Headlight saloon is, and was going south towards Main Street, and had walked about 150 feet when I heard the first shot. I heard the first,

and then in a few seconds I heard the second shot, and then, in a little while, the firing became general. I think I heard twelve or more shots. I was not in sight, and saw none of them, but I think I heard as many as twelve shots. I do not say that I did leave Brewer at Lacy's saloon either, when I left there, but I know I left Brandenberg there. When I first saw Brewer after this, it was near 150 feet from the saloon there on Elm Street, east from the saloon. Henry Miller was going east then, I suppose. I suppose Brewer and Brandenberg both had pistols, but I am not certain; all policemen carry them. I did not see Brewer's pistol on that day, though. as I was in a hurry, and I just asked him the question if he was hurt, and only tarried a second and went right on. From where I had left him at the saloon he had run in an easterly direction about 150 feet I think, or more.

I did not hit the defendant over the head with my pistol when I took his pistol from him. I did not strike him at all. I did not knock him up against the fence. I did not make that scar on his head. He was leaning against the fence when I went up to him. No, sir, I did not say to him, "God damn your black soul, what did you kill Brewer for?" Henry Miller did not say, "I did not kill Mr. Brewer. I have not seen Mr. Brewer. Some of you have killed him and laid it on me." He just said, "All right, Mr. Jim." That is all he said. He had a skinned place on the side of his head about the size of the end of your finger, when I went up to him, and it was bleeding. Well, I do not know that the blood was running out of it, either; but it appeared to be fresh. It was not a big mark or scar. I can state how the scar came there if you want me to.

On redirect examination, he said: I want to tell how it came there. When I went down to the wagon, I said to Henry—a crowd had come from up there where Brewer was shot, and I knew there would be trouble, and I said—

Defendant objected, and court said, "Do you know of your own knowledge how that scar came there?"

Answer. "Well, I know that he was struck. I saw some one strike him."

Court said, "State who it was."

"Mr. Ganaway struck him."

Question. "What did he strike him for?" Defendant excepted.

Question. "What did the defendant say when he was struck? And what did he say when he was first asked if he killed Brewer, at the very moment he was apprised of the fact?" Defendant objected.

State said, "It is part of the res gestæ," and cited court to cases, etc.

Court said, "Ask your question, and let's see what it is."

Question. "How far was it, if he made any statement, from the dead body of Brewer?"

Answer. "I suppose it was 100 yards, or maybe more. I do not

know exactly how long it was after I left the body of Brewer until I got the prisoner to the wagon, but it could not have been more than five minutes, because I brought him just as soon as I could get him there.''

"Did he make any statement in answer to anything that was said in the crowd?'' Defendant objected to this, as the defendant had been brought a considerable distance, and I did not think they could have reached that place within 100 yards the way they went.

Witness said: " No, I meant the place where we put him in the wagon; it was about 100 yards from where we caught him. The way we brought him was about 100 yards; back it was about 100 yards. From where the killing occurred, the route the defendant traveled to where we caught him must have been 300 yards, I expect.'' [Defendant objected, saying they brought him back 100 yards or more with the nippers on him, and it is not right to prove anything he said under those circumstances. Objection overruled. Defendant excepted.] ."Just as we were putting defendant in the hoodlum wagon, he said, 'Tell Sam Miller to come down here; by God, I have got my man.' Mr. Durham told defendant that Brewer had been killed, and then he made this remark just after he was told that Brewer was dead. When I arrested the defendant I told Durham, one of the policemen, to be back there at the wagon, and Durham said, 'Make the son-of-a-bitch sit down there; he has killed Brewer.' Then defendant said, 'Tell Sam Miller to come down here; by God, I have got my man.'"

On recross-examination, he said: After I made the arrest I carried the prisoner down Swiss Avenue to Hawkins Street, and then down Swiss Avenue to Elm Street. We traveled at least 300 yards, and then we met the hoodlum wagon. I was just putting him in the wagon when Durham remarked, "Make the son-of-a-bitch sit down; he has killed Brewer.'' I did not say that Durham said Brewer was dead. I did not mean to say it, but Durham said, "He has killed Brewer.'' I have an idea Brewer died fifteen minutes after he was shot. I suppose Brewer was dead then. No, I do not know that there had elapsed more or as much as fifteen minutes from the time he shot Brewer until he made that remark. After Durham made the remark he did, Henry Miller said right away, "Tell Sam Miller to come down here; by God, I have got my man.'' I know it could not have been fifteen minutes from the time he shot Brewer until he made this remark. I told him after these remarks, to get in the wagon, or he would be killed within two minutes. I saw the crowd coming, and I was afraid he would be killed. Then it was that this man Ganaway hit him. He struck him on the head. I do not know whether he hit him in the forehead or not. He did have a small place on his head when I arrested him, and I saw Ganaway strike him after I arrested him. I did not examine his head when I took him to jail to see whether there were two wounds on it or not. I said Ganaway struck him, but I do not know

whether I said Ganaway made one of these wounds on his head or not. Ganaway did make a wound on his head. It bled. The defendant threw some blood on me while I was taking him to the station house.

Ben Nelson, witness for the State, testified: I live at 576 Elm Street, in the city of Dallas. In May last I was attending bar for Morris Lacy. His saloon is on the corner of Elm Street and the Central Railroad. I was present at the time of the trouble here inquired about. Henry Miller and Commodore Miller came in the saloon and took a cigar apiece, and walked out across the street, and there Brandenberg arrested him, and brought him in at the front end of the saloon, and Mr. Beard called for the patrol wagon. Brandenberg was standing up against the door-facing, and Miller, the defendant, a little further back in the house, near the lunch counter, and some colored fellows stepped up on the outside, and Henry Miller asked one of them if he would go his bond, and Brandenberg said that he could not give him bond, as he did not know the charges against him; and he (Brandenberg) was talking to a colored man on the outside, and Henry jerked out his gun and said, "Here is my bond," or "I will get bond," or something like that, and as he said it he jumped out the door and pulled his pistol and shot, and he still ran backwards off the sidewalk, and he stumbled off the curb, I guess, because he made an awkward step, and then he shot again and broke and run, and then shot the third time near a horse tied out there. They were in the house about fifteen minutes before all this difficulty came up. Miller's third shot hit the front end of the saloon. After he fired the first shot Brandenberg fired at him. Brandenberg ran up on the south side of the street, and Henry Miller ran up near the middle of the street, and when he got somewhere near Hawkins Street, he turned around and shot Brewer. Just before he was going to make the turn on Hawkins Street he turned around and took his arm somehow this way (holding his right arm with his left) and he and Brewer shot about the same time. Brewer shot just as he was falling. Henry Miller shot Brewer first.

When Henry Miller first drew his gun, Brandenberg was talking to a man. Brandenberg had nothing in his hand while he was talking there. When Miller first fired, the shock and smoke sorter knocked Brandenberg up against the side of the house, and he could not shoot right away, until Henry Miller got a little ways up the sidewalk. Miller left the sidewalk. Brandenberg could not shoot at first. He left the sidewalk somewhere about the barber shop up there, and when he left the sidewalk he shot. Brewer was running up the street about the middle of the street then. He was not running up the street at the time of the first shot, though, but he was standing out there talking to a man, near the corner of the sidewalk, near the railroad. That was on the south side of Elm Street, and on the east side of the Central Railroad. Brewer was about fifteen feet from Brandenberg when the first shot was fired by Miller. I did not

see Brewer running until after Henry Miller shot the second shot. Then Brewer ran out in the middle of the street and started up after Henry Miller. I did not hear Brewer say a word. He did not say a word. After I saw Henry Miller shoot the second shot, I saw Brewer start out from the corner there, where he was standing. He ran out this way, and got somewhere near the middle of the north side of the street. He was nearer the north side of the street than he was to the south side or middle of the street. I did not see Brewer have anything in his hand. I saw Henry Miller shoot at Brewer. Brewer was running after him, and he seemed to see Brewer just as he turned. I could have seen Brewer's hands if I had taken notice, but I did not notice him have anything.

Henry Miller did not have much to say when Brandenberg and Brewer brought him in the saloon. All that I remember of his saying was about that bond. Jim Beard telephoned for the patrol wagon with our telephone. Jim Beard was in there just before Miller was arrested, and was there when he was arrested, after he called for the wagon; then he went out toward Main Street on the north side of the house. I saw Jim Beard about the time Brewer fell. He came running around the corner of the house from the Central Railroad there. I told him to run, that Brewer was shot, and he ran up to Brewer and sorter raised him up and saw that he was shot, and the wagon of the fire department came along and Beard jumped into that and went on and made the arrest. Henry and Commodore Miller came in there at my saloon before Beard did, and before the defendant was arrested, and they walked down to the lower end of the counter near the ice chest, and called for cigars, and got them, and walked out. They walked out one door, and Jim Beard came in the other door about the same time, and these negroes went across the street where Brandenberg and Brewer were, and this defendant got arrested, and then Jim Beard came back there as soon as the prisoner got there, and called for the wagon. When Brewer was shot he fell right back and sorter raised up, and then he threw his hand there and fell back again. It looked like he sorter raised up and saw that he was shot; and Jim Beard came up there and saw that he was shot, and then he went right on after Miller. This was in Dallas County, Texas, on May 24, 1892.

Cross-examined, he said: This was about 5 or 6 o'clock in the evening. I was on duty as bartender at that time. Nobody was attending bar there then except me, but there were several people in the house, eating. The north end of the bar is six or eight feet from the north door of the house, I reckon. The counter runs north and south in the building, and on the east side of the building. There are two sets of double doors there in front. Both of these were open at the time. These doors are six or eight feet apart, and about as wide again as that one there (about three feet). I suppose the doors themselves are six feet apart—a space of six feet between the doors. This makes a kind of wall

between them, solid. The door would be right here, and the bar counter would be right back there, just like that jury box. There is a space or open place outside of the doors, making a space of about four feet from the front door before you get to the sidewalk.

While this business was going on, I was sitting at the north end of the bar on a stool, looking at them and listening. I had waited on several gentlemen that were eating, and Commodore and Henry Miller went down by the side of the counter and got a cigar, and then they walked on across the street, and Henry got arrested, and was brought back in there. I don't believe the officers took hold of the prisoner when they brought him back. Yes, I believe Brandenberg came leading him in the saloon, or holding him by the left arm. Brandenberg had his right hand holding to Henry's left arm when they came in the saloon, I think, but I do not know which arm he had him by, for sure. Brandenberg was standing up against the door-facing, and Henry was standing further inside—two or three feet. Just as Henry backed out of one door, Brandenberg backed out of the other, and just as Brandenberg got out, so Henry could see him good, he fired at Brandenberg. He shot between the post and the wall. Henry was somewhere near the sidewalk when he fired. He was twelve or thirteen feet then from where he commenced backing out before he fired. Before the shooting, Henry turned around, and was talking to the men that came in the west door. He asked a man there if he would go his bond.

Brandenberg backed out and Henry Miller ran out backwards, and about the time Brandenberg got out Henry cut down on him. I guess they were in full view of each other when they got out of the door. I was sitting right there, looking at Henry, when he shot, and was within ten feet of him when he shot. I saw Brandenberg, too. I did not have to look through the wall to see him. Here is the space between the doors, and the door is here, and I was sitting over there, and I could see them both back out of the door. I reckon Brandenberg was backing to get out so he could see Henry. Henry jerked out his gun and threw it in his, Brandenberg's, face, and both of them began to get out backwards. I do not know that Brandenberg was trying to get his pistol before Henry shot first. I don't remember whether I was noticing his right hand before Henry shot or not. I saw his right hand, but I do not know whether he was trying to get his gun or not. I do not know what he was doing with his hand when Henry shot. As well as I remember, though, he was trying to get his gun when Henry jerked his gun, and before Henry shot. Well, Henry jerked his gun and walked back five or six steps before Brandenberg saw that Henry had his gun out. Henry stepped back far enough to get out of the door there before he commenced shooting.

The flash from Henry's pistol threw Brandenberg back against the wall. Henry fired as soon as he could. Henry had no smoke in his eyes after

the first shot, I do not reckon, but Brandenberg did, and Brandenberg did not get a chance to shoot for some time. Brandenberg fired as soon as he could see clearly. I think Henry's shot went over the house. He was aiming to shoot, I reckon, and he kinder fell backwards, and his gun went off in the air. I saw Brandenberg and Henry both when Henry shot the first shot. Brandenberg did not get his pistol out at first. He reached for it after Henry fired the first shot, or rather at the time Henry was trying to shoot the first shot, but he did not get his pistol out until after Henry shot. I suppose his pistol must have hung. I reckon the sidewalk is ten feet wide there in front of Lacy's. The first shot went over the house. It struck an engine standing out there on the railroad. Brandenberg had got outside of the door. He did not have to make but one step to get out. I do not know for sure that Henry's bullet hit the engine, but he shot towards the engine.

Question. I thought the shooting was at Brandenberg?

Answer. Well, Brandenberg was sorter between Miller and the engine. Brandenberg was sorter in that direction. I could not see the engine from where I was sitting, but the fireman and the engineer of the engine were stopping with me then. They were eating supper in the saloon then. I was not looking at them, but I know they were eating. Henry went off the sidewalk, and went thirty or forty feet from the saloon before he shot the third time. He was running all the time, with his pistol in his hand. I think when Henry shot the third shot Brandenberg shot the first time. Henry was running sideways and sorter backwards when he shot the third time. He was kinder turned round, this way. (Shows how.) He would shoot from the right side, and then from the left. He would throw his left side towards Brandenberg, and was trying to run with his left side in the direction of Brandenberg. He did not turn around and deliberately face him and shoot at him, but he would throw his face around to him.

When Henry Miller shot the first shot I got up off the seat and ran to the door, and when I got to the door Henry shot again. Brandenberg had gotten to the east door then, when I got to the door. I jumped over the banisters then, and got to the door about the time Henry shot the second shot. Henry backed ten or fifteen feet from the outside door there before he shot the second shot. Brandenberg was on the sidewalk, and kept the sidewalk until he got in front of the barber shop there, the third door from the saloon, and then he took to the street. Henry never did get back on the sidewalk any more after that time, but he kept near the middle of the road. After Brandenberg left the sidewalk, there at the barber shop, he went on up the south side of the road, near the sidewalk, and was about half-way between the middle of the street and the edge of the sidewalk. Brewer was standing on the corner of the sidewalk and right at the railroad, talking, when the shooting commenced, and my eye

first flashed on him just before he was shot; that is, after he left the front of the saloon. He started off pretty soon after the shooting commenced. I did not see him start to leave the sidewalk, but after that I saw him about the time the third shot was fired. When I saw him after the shooting commenced he was near the north side of the street, and then he was on the south side of the street, and then he was about twenty-five steps from the railroad, I guess. I do not know how far Henry was when he fired the third shot from the corner of Lacy's saloon. He was not 150 feet from it. I reckon he was about as far from it as from here to the corner of the house back yonder. (In temporary court house, say 70 or 80 feet.)

After I saw the shooting begin, Brewer was about twenty steps from Henry, when I saw Brewer after the shooting began. It is about twenty steps from me to the corner of the house over yonder. Brandenberg was about half-way between Brewer and Henry Miller, but he was on the south side of the street. Brewer was as close to Brandenberg as he was to Miller when Brewer was shot. I saw smoke come out of Henry's gun, and I saw Brewer drop immediately, and that was bound to have been the shot that hit him. Brewer was not quite half-way between the railroad and Hawkins Street when he was shot, but Henry Miller was just making the turn down Hawkins Street when he shot Brewer. He had not made the turn yet, but was somewhere about ready to make the turn. Henry was running sorter sideways toward Brewer. Brewer shot about the time he fell, after Miller shot him. I can tell which of the two shots went off first by the smoke of the guns more than anything else.

Question. How can you tell?

Answer. This way (snap, snap; snapping his fingers). Yes, sir; somehow that way. Brewer fell right backward when Henry Miller shot. I do not know whether Brewer fired his shot when he was falling backward or not. Jim Beard was about the first one to him. I did not hear what Jim Beard said to Brewer; I could not hear it. Beard was with him not more than a second or two. I saw Beard stop the fireman's wagon. Beard got in it, and a man drove pretty pert, down Hawkins Street. I do not know whether anybody got out of the wagon or not. I think maybe Tom Myers was in there driving the wagon. I do not know whether Myers was in there alone or not. Beard got in the wagon on Elm Street. I saw him leave Brewer and run and jump in the wagon, I suppose. I am not sure that he got in the wagon on Elm Street. There was such a crowd there that I am not sure. Well, I did not see Beard just as he got in the wagon. I guess he got in the wagon somewhere along there on Elm Street. I saw Beard when he turned Brewer loose. I don't know, for certain, whether I saw him when he got in the wagon or not. The wagon went down Hawkins Street, north, but I could not see anything of them after they turned the corner up there.

I do not know that Brewer fired any shots, or more than that one. I am not certain that Brewer shot, but I am certain that he had his gun out. I did not see him when he first got it out. I do not know whether I saw Brewer's arm extended out or not, but I heard the shot and saw the smoke from the pistol. He was shot east. By the time Beard got to Brewer Henry Miller got around the corner. Henry was looking back all the time; sorter running sideways and looking back, running fast, but stopped when he shot Brewer, and turned around facing him. He was running as hard as he could, I reckon, and when he shot Brewer he kinder stopped still, or about still, and then he ran off after he shot him. I am not sure that Henry got perfectly still, either, but he stopped, and he faced around and took the pistol in both hands and shot and killed Brewer. That was the fourth shot that Henry made. Brandenberg never did make any stop, but turned the corner and was still after him. I don't know whether he (Brandenberg) turned the corner before Jim Beard did in the wagon or not. Beard came along and raised Brewer up and saw that he was shot, and laid him back down, and went on to the corner and got in the wagon. About the time Beard got there the wagon was there, and he got in it. The wagon came from the west, going east. The wagon seemed to be in the chase. It overtook the parties there, I reckon.

When I first saw Brewer, after the shooting commenced, Brandenberg was on the south side of the street and Brewer was nearer the north side. I suppose Brandenberg was shooting at Henry Miller, but I do not know. He was shooting, though. I do not know exactly how Brandenberg had his hand when he was shooting, as he had his back towards me. I do not think that Brewer had hold of Henry Miller when they first arrested him. I don't think that Henry stepped up on the platform at the Union Depot, but was about to do it. They caught him just about as soon as he got there. I did not see Brewer touch him, but he could have done so without my seeing him do it. Henry Miller had on a blue coat, and he jerked it open and pulled out the pistol from inside there somewhere. He commenced unbuttoning his coat when Brandenberg was talking to him about his bond. When Brandenberg told him he did not know the charges against him, and the other fellow said something, then Henry sorter commenced unbuttoning his coat. I did not hear Henry say that he had not done anything to be arrested for. I just heard him ask another fellow if he would go his bond. The other fellow walked up, and Henry asked him if he would go his bond. I do not know what they said when they were crossing the street. And I do not know what all they did say, but anyhow, Brandenberg said about that time, he could not give him bond, and then Henry just jerked his coat open and drew his gun, and threw it in Brandenberg's face and began to run backwards. He began to run backwards as soon as he drew the pistol out. He had not got out of the door when he first threw it down in Brandenberg's face. The muzzle

of the pistol was about as far as from here to that door-facing from Brandenberg's face (say three feet). Henry did not shoot until he got on the outside. Brandenberg was not looking at Henry when Henry jerked the gun out and threw it down in his face. No shot was fired until Henry got out of the door. My porter's name was Boykin Shivers, and he was in the saloon there somewhere at the time. He had just gone back into the store room to get out some goods. He said he was in the store room, and that is all I know about where he was during the shooting. I do not know whether there were brass buttons on Henry Miller's coat or not.

W. L. Scherer, witness for the State, testified as follows: I am a stenographer. During the time of the difficulty here inquired about, I was sitting up in the Central Hotel, reading. I think this hotel is about 115 or 120 feet from Lacy's saloon, on the north side of Elm street, facing east, on the west side of the Central Railroad. I was sitting in the window of that hotel reading a paper. I· heard the first shot, and, looking up, saw the rest. The first shot was. fired by Henry Miller, I think, and then I saw Brewer shoot, which was about the fourth shot, and Brewer fell. Henry Miller held the pistol this way (holding one arm with the other), and he stopped and turned around and fired this shot when Brewer fell. When Miller fired the first shot that I saw, he was not quite in the middle of the street. He ran out and shot sideways, sorter. This shot was east of Lacy's saloon. That was the second shot that was fired, but the first one that I saw. He seemed like to just shoot this one in the crowd, and did not look like he shot at anybody.

I did not see Miller until the second shot was fired, but I saw him just as that shot was fired, and he fired it. That was just the time I saw Miller. Brewer was in the middle of the street when I first saw him, about twenty feet east of the saloon. Brewer fired his pistol either the second or third shot. I think he was running. Then there was a shot that hit Brewer. It looked like Miller shot on each side, and then took aim and hit Brewer. I saw some one that went up and took hold of Brewer, Wallace Fete, but I do not know the other man that I saw go up there to him. He helped carry him into the saloon. I think I saw Jim Beard there a couple of minutes. I think he. ran to Brewer and said something, and struck out again and left him. I do not know where he went from there. I went out to the body, and got there just about the same time Beard did, or Beard got there just an instant before, nearly. I heard Brewer say something about giving him a drink of water, and something about his wife and children. [Defendant objected to anything that Brewer said, except it be about the shooting. Overruled. Defendant excepted.] I could not understand what he said about his wife and children, but he asked them not to let him die for a drink of water. This was late in the evening, but I do not know the time of day now by the clock. I did not know Brandenberg personally. I knew the other

two by sight.  I think Beard was the one that brought Henry Miller down to the wagon.

Cross-examined, he said:  That Central Hotel is on the north side of the street, and Lacy's saloon is on the south side.  The first thing that attracted my attention was the shooting.  I dropped my paper and looked up, and then I saw a shot and saw all the rest of it.  When I looked up I do not know whether I saw Brandenberg or not.  I heard a shot before I saw anybody.  I did not see defendant as he went off the sidewalk. When I saw him he was out near the middle of the street.  I think this was the second shot that was fired.  I saw some one running after Miller then, but I could not tell who it was, but I found out that it was Mr. Brewer, in a short time.  After defendant fired the second shot he was running on and still firing.  He was running kinder sideways.  It was either the second or third shot that I saw Brewer fire.

B. F. Brandenberg, witness for the State, being sworn, testified as follows:  I am a policeman in the city of Dallas, and have been since August 15 last.  I have lived in Dallas about three years.  I was on duty about the 24th of May this year.  I was on the South Dallas watch.  C. O. Brewer was a policeman of this city during May, 1892.  He is dead now. I was present when he was killed.  Mr. Cornwell gave us an order to arrest Henry Miller.  Cornwell was the assistant to the chief of police. He was the one that gave me an order in regard to arresting Henry Miller. Well, about half-past 6 o'clock on May 24 last, Mr. Brewer and I arrested Henry Miller just as he stepped up on the platform at the Union Depot. As soon as we arrested him we took him over to Lacy's saloon, close there, and we stopped right at the head of the lunch counter.  Henry Miller turned to me and asked me if he could give bond.  I said, " No, Henry; I do not know what the charges against you are, and I can not give you bond.  I think if you go down to the calaboose and see Ed (Cornwell), that it will be all right, and you can fix it with him."  There was a crowd of colored men that came around there and were standing close by, and Henry asked one of them if he would go his bond.  I told him no, that I could not give him bond.  Then Miller jumped back and said, " By God, I will have bond," and began to draw his pistol as he said it.  He shot at me just as I stepped out of the door, and it staggered me to some extent, and I would have fallen had it not been for the corner of the house.  I did fall against the corner of the building, but I recovered.  Then Henry Miller ran off, shooting back in the direction of me, and shot three shots in that direction.  After he shot he ran out in the street and up in the direction of Hawkins Street, and when he got near the center of the street he turned around and fired straight at Brewer. Brewer was running after him at the time, too.  That was the last I saw of Brewer.  He was something near Hawkins Street when he made this shot.

As the negro (defendant) was turning in Hawkins Street, he turned

and fired at me again. That was the sixth shot he fired. We ran him on down to Swiss Avenue, and he was captured on the south side of the street. On the south side of the street where the firing commenced, there were some horses and wagons hitched, and I was running along by the edge of these wagons to screen myself from the shots. We first met Miller at the edge of the platform of the Union Depot, just as he was going to step up on the edge of the platform. That was right north of Lacy's saloon. We first saw him when he went into Lacy's saloon. I spoke to Brewer, and asked him if that was not Henry Miller. He said it was, and we went over there. Well, Jim Beard walked up just as we were talking about it. Jim Beard is a policeman also, and that was on Jim Beard's beat up there. Commodore Miller was with Henry Miller that day. We first saw Commodore Miller and Henry Miller (defendant) when they walked into Lacy's saloon together, and Mr. Beard went over there to arrest him. Beard walked in at the west door of the saloon, and Henry and Commodore Miller came out the east door and walked across the street towards us, and we made the arrest just as he was stepping up on the platform. He did not offer any resistance. We carried him right back into the saloon, and Jim Beard called the hoodlum wagon for us from the station. Brewer was standing right by the side of me when I arrested Henry, and he went with me to Lacy's saloon. After we got there, Brewer was standing a little to my left on the doorsill, and Henry Miller was standing just on the inside of the saloon, a little back from the sidewalk. There is a sort of an air chamber, a recess, or vestibule, in front of the saloon; that is, the door of the saloon does not open right on the sidewalk. When we got over there on Swiss Avenue, Mr. Beard arrested Henry Miller. I was within about twenty feet of him when he caught hold of him, and was there in a short time. That is when he was arrested the second time, the time Mr. Beard caught him on Swiss Avenue. After he was arrested, we took him back to the wagon and put him into the wagon and carried him to the city hall. Mr. Ganaway had charge of the wagon.

When Henry Miller first pulled his pistol, and said that he would have bond, and fired, Brewer, Beard, nor I had done anything in the world to him. We had our weapons in our scabbards. As he said, "By God, I will have bond," he jumped back when he was saying it, and pulled his pistol and threw it down like this (shows), and he stepped back, and I stepped out on the sidewalk, and as I did this he fired, and he fired first as he backed off the sidewalk, and he started to run, and the third shot he fired at me. I was running after him during that time, and I commenced shooting at him. Just as he shot the third shot I fired at him, and that was just as he was leaving the sidewalk. A crowd of people came in between him and me, and that is the reason I was so long in getting a shot at him. There was a buggy between him and me, and as soon

as the buggy was clear he fired his third shot, and then I fired at him the first time. When he shot the fourth shot he turned around just like this, and held the pistol this way, and shot clear down the street. (Illustrating how the defendant did, resting his right arm on his left hand.) He did not shoot that shot at me, as I know of. This all happened in Dallas County, Texas, on the 24th day of May, 1892.

Cross-examined, he said: Beard, Brewer, and I did not all belong to that beat. Brewer and I had our regular beat in South Dallas, but that was Beard's beat up at the depot there. That was Beard's time of day to be on duty. Miller was just on the edge of the sidewalk, going into Lacy's saloon, the first time I saw him. I was on the platform, just the width of Elm Street from him, 50, 60, or maybe 80 feet from him. I saw the defendant go into the west door of the saloon, and Jim Beard went in right after him, and defendant Miller walked out of the east door of the saloon, and he and Commodore Miller came right across the street toward Brewer and me. When he came up, I took hold of him and made him my prisoner. Brewer was with me then. We then walked across the street to Lacy's saloon. When we got in there he asked me for bond. I told him no, that I did not know what he was charged with. I did not know what he was charged with for sure. I did not see him do anything. I did not have a warrant for him. I had an idea what he was charged with. I just said, "Henry, I want you." He said, "All right." He walked across to Lacy's saloon with me. We talked quite a little time in there, until a crowd collected, and Miller spoke to one of the parties standing in the crowd, and asked him if he would go on his bond, and then turned and asked me if this party could not go on his bond. Then as soon as I took my eyes off of him, he stepped back and pulled his pistol. When I looked around he drew his pistol on me. I was standing still then. When I saw him drawing his pistol, I jumped behind the door and started to draw mine. I did not start to draw mine before I jumped behind the door; not till after I jumped. Just as I stepped behind the door I grabbed for my pistol, and just as I stepped out on the sidewalk he fired at me. I was going for my pistol just as I stepped behind the door and out on the sidewalk, and I got my pistol out just about the time he shot. Then he broke and ran. I had my pistol in my hand then. Then he shot the second time. I ran after him. I had my pistol in my hand just like this. (Shows how, by leveling and extending his right arm.) I made no effort to cock it until I got ready to shoot. I was after him, with my pistol in my hand, and he was running. I would have shot before I did if there had not been a crowd between us, and I would still have shot at him sooner if there had not been a buggy between him and me. Just as he left the sidewalk I was about thirty feet from him, and I would have shot then had it not been for some people in the way. Then he got off a little further, and I would have shot then if it had not been for a buggy.

When Brewer was in the middle of the street running after Miller I did not notice what Brewer had in his hands. I saw him when he left the sidewalk and started to run across the street. He just jumped off the sidewalk and started across the street, as if he was going to head Miller off. I did not take time to notice him particularly. He did not have his pistol in his hand then. Henry Miller was on the south side of the street. Brewer was running to the north side of the street, as if he was going to head Miller off. I was not noticing him all the time. I was right behind him. I did not see Brewer at that time. After I saw Brewer the last time, Miller shot two shots after that. I do not know what position Brewer was in when the last shot was fired by Henry Miller. Beard had walked out of the saloon and had walked down the Central track, as I was told, but I do not know. I did not see him in pursuit of the defendant. I do not know where he was. Miller shot three shots before I shot any. While and up to the time the fourth shot was fired, I traveled something like 100 feet, or maybe 150 feet, for all I know. We both started from about the same point and went about in the same direction. I did not see what Miller shot at the fourth time, but he did not have his gun (pistol) directed at me. The fifth shot he shot at me. I shot at him then. I shot in all five times. I did not hear any shots except those fired by Miller and me. I do not know that there were any others fired. The last shot he fired was up about the Texas & Pacific Railroad, and just as I got down the Texas & Pacific embankment I shot the last time. This would be about 250 yards from Lacy's saloon. After we turned on Hawkins Street, several parties came out and took up the pursuit with me, but no officer was with them. I saw no officer until after I had passed the Texas & Pacific Railroad, and then I saw Jim Beard. I saw him head around on Hawkins Street, and he was in the chief of the fire department's buggy.

The second shot of Henry Miller was fired just after he left the sidewalk. It was not while he was on the sidewalk. He did not stumble or fall off the sidewalk. His first shot was fired clear above my head. He turned his arm back just like this (putting his arm over his shoulder). He did not fire his shots up. I do not know how high up in the air this first shot went, but he turned his elbow just like this. I do not know that Brewer fired at all.

Brewer was shot in the right side, and the ball went in the eighth rib. I did not see him at the time he was shot. The last time I saw him he was going on the north side of the street, to the north of Henry Miller, going from the south side of the street. Henry Miller was on the sidewalk, while Brewer was running across the street. He ran up the sidewalk something like about the length of this house. (Say about sixty or eighty feet.) He was on the south side of Elm Street, on the same side

I was on.   Brewer ran from the south side of the street, in a sort of an angling direction to the north side of the street.   The last time I saw Brewer I was nearer him than the defendant was.   I do not know whether he continued to angle across the street or not.   After I passed on, I did not see what Brewer or anybody else did.   This difficulty created a great deal of excitement when it occurred.   That is, a considerable crowd of people gathered around there by the time we captured the negro.   I passed out the way of the crowd, though I did not see people any more. I did not hear any hallooing.   Nobody said anything that I know of, except what I have said.   I hallooed at Miller to stop.

I did not hear Brewer say a word to him.   I was looking at Henry Miller when he went off of the curb.   He did not back off of the curb. He backed off from me at first, but he ran off from the side of the sidewalk just like this.   (Shows how, running forward and looking backward sideways.)   After he got out about eight feet in the street from the curbing, he turned around and fired at me, just as I told you.   He went off the curbing foremost, looking back this way.   He did not back off.   When I fired the first shot at him he was one-third of the way from Lacy's saloon up towards Hawkins Street, or fifty or seventy-five feet, I reckon, from Lacy's saloon; but I just guessed at it.   When Miller fired the first shot he was standing near the east door of Lacy's saloon, in the door about, and he fired around these doors.   The front of the building goes up perpendicular, and fronts of the doors stand back from the vestibule some, and he was right in behind this set of doors, and as I stepped out from behind the door he fired.   Then he ran off from the door.

If I had expected any trouble I could have held him there perfectly tight, and he could not have done anything in the world, because I was close to him at first.   I was standing in one door and he in the other when he said, "By God, I will have bond," and fixed to shoot.   He went around these doors that folded back there.   He went out east of me.   From where he fired to where I was standing it was about eight feet.   When he fired the first shot I do not know where Jim Beard was. I saw Miller fire the fourth shot, and he took his right arm with his left, this way.   (Taking hold of his right wrist with his left hand, holding it steadily.)   He held his pistol steady and fired.   He was about the center of the street then.   He had left the sidewalk and went angling across the street, and stopped and caught his arm that way, and fired down the street.   I was thirty or forty feet from him then.   I fired at him just as he made this shot.   That was the only shot he fired in that direction.

No, sir, I did not say at Brewer's home on the day after this killing, in the presence of Ed Smith, E. F. Gates, Mr. Farris, Rue, and others, when they were embalming the dead body, that the shot that struck Brewer was a glancing shot; that it struck the sidewalk and glanced and struck Brewer.   I said from the looks of the ball taken out of him that it

looked like it hit the blocks before it hit Brewer.   I did not say that it glanced and then hit him, and that it could not have struck Brewer any other way.   I had left the sidewalk and was out in the middle of the street when Miller stopped and fired that shot.   I suppose that I got fifty feet from where I had left the sidewalk for the street.   I was thirty or forty feet from Miller then.   I did not get any nearer him than that.   I was not fifty feet from the sidewalk, but that far, I suppose, from the place where I left the sidewalk.   Ed Smith said that the ball must have struck the sidewalk, as it would have crushed it that way if it had.   I do not know where Brewer was when Miller made this fourth shot.   I did not see what Miller was shooting at.   I was not looking back.   The next time I saw Brewer, after I saw him crossing the street the way I described, I saw him in Johnson's drug store, opposite to where the negro shot him. I was told where Brewer fell, but did not see them pick him up.

When Miller fired this fourth shot I reckon I was ten or twelve feet from the nearest point from the sidewalk, but about fifty feet from where I left the sidewalk.   There were some buggies and horses hitched along there, and I ran along by the edge of them to screen myself from the balls.   I reckon the sidewalk is six or eight feet wide.   There was a crowd of negroes that came along up there, but I can not name any of them.   I did not have time to inspect the crowd very closely, but I did not notice any white men in the crowd.   Ben Nelson was in the saloon, and several others, and several railroad men, I took them to be white men, sitting along the counter, eating.   I do not remember any of their names except Ben Nelson.   We talked some little time about the bond. There was a right smart little time between the firing of my first shot and the last shot I fired.   I think maybe I had passed ten feet between them. I think there were eleven shots fired in all, that I heard.   I can take you up there and point the places where all the shot were fired.   I fired five shots, and he six.   I can state that there were as many as eleven shots. I do not know that there were no others fired, but eleven shots are all I heard.   None of us had any warrant for the arrest of this negro, that I know of.   I did not.   I had seen no complaint filed against him.   Cornwell did not tell me what he was charged with.   I was told to arrest him through Ed Cornwell.

On redirect examination, he said:   I was on general duty that day. General duty means for me to go all over the city, wherever I am sent or needed.   Brewer was on general duty with me that day.   When Henry Miller was talking about his bond, Brewer was standing out on the edge of the sidewalk talking to Mr. Brecht, I think.   When Miller ran off and I ran after him, Brewer was just west of me, standing a little behind me.   That would throw him in our rear and west of us.   Henry Brecht lives out on Williams Street.

Dr. J. A. Ewing, witness for the State, being sworn, testified as fol-

lows: I have been practicing medicine about eighteen years, all the time in this county. I am a graduate of the Bellevue Medical College of New York. I examined Mr. Brewer not more than a minute after he was shot. After I carried him up to my office at the drug store I saw that he was in a dying condition, and I did not make a careful examination at the time. I examined him, though. The wound was about two inches to the right of the middle line, and between the seventh and eighth ribs, and it was about two inches below the right nipple, about here (placing his finger on his own person to indicate). Maybe it was two and one-half inches below the nipple. The ball went almost directly through him. It went through the body and came out pretty close to the spinal column on the same side of the body; that is, to the right of the spinal column; but it went in to the right of the breast bone. It ranged rather toward the center of the body, and was maybe a little closer to the spine than the place where it went in. I got the ball out the next day, after he was dead. The man was dying when we carried him into the house, and the wound was necessarily fatal. The gunshot wound caused his death. He lived about fifteen or twenty minutes after I took him to the office. The ball going through in the course that it did go would naturally go through the liver, and there are blood vessels that it could sever going that way. I think that Mr. Brandenberg or some of the policemen had the bullet that came out of him. He was shot not quite a block from my office. This was in Dallas County, Texas, on the 24th day of May, 1892, or the 25th.

Cross-examined, he said: I saw two shots by the boy Miller—Henry Miller—and I saw Brandenberg shoot two shots. I did not see Henry at the time of this examination. I made the examination between 6 and 7 o'clock, nearly night. The ball in going through the deceased deflected a little bit, because it struck a rib, and the deflection was downward some. I do not think that the ball could have glanced from the street and inflicted that wound. The range would have been upward in that case. I heard some shooting, but I do not know whether I heard the first shot or not, but I suppose that I heard the first shot, as it was right close by. I did not see them at the time of the first shot, but I reckon I saw them about the time of the third shot. I saw the defendant shoot two shots, and I saw Brandenberg shoot two. When I saw him fire the first shot he was about at the baker shop there, and then he went a little further and shot the second shot. That would be about fifteen steps from Lacy's saloon. I think there is but one building between the saloon and the baker shop. I do not know when Brandenberg fired the first shot at him, but he was about ten steps from the saloon when he fired the first shot that I saw him shoot; not Lacy's saloon, but that other saloon. I think that other saloon is about four doors, or forty or fifty feet, from Lacy's saloon. When Brandenberg fired the first shot that I saw him fire, I say that he was about forty feet from Lacy's saloon, I think. When he fired

the second shot he was a little further up toward the drug store. When Brandenberg fired the first shot, the defendant was not more than twenty-five or thirty feet from him. The defendant was running, and Brandenberg was running after him. When Brandenberg fired the second shot the defendant was running and Brandenberg was running too. When I saw the defendant shoot the second shot he turned. I did not see the defendant fire any third shot. When I saw the defendant fire the last shot that I saw him fire, he was about opposite Williams' drug store, and then he ran out and turned the corner. When the defendant fired that second shot he sorter turned and threw the pistol around this way (leveling and resting on his forearm), and Brandenberg was down toward that old store of Gard's. Brewer was lying down when I first saw him. I did not see Brewer when defendant stopped and fired that last shot that I saw him fire, but the defendant did not shoot it at Brandenberg, but shot it down in the middle of the street. I was looking so I could see Brewer, but I was holding a lady's horse and looking at the defendant too. The defendant did not stop right still either, when he made this shot, but he just sorter turned his head around, and turned himself around in the middle of the street, and he threw his left arm out this way and rested his right arm on it. I did not see him shoot any more after that. He then turned the corner and went out of my sight. A moment after I saw the defendant fire this shot, I saw Brewer lying in the street. I think the defendant was running the last shot he fired, and he turned around and looked back, but did not stop, but turned his head around, and then fired, and went on and continued running.

Ed Cornwell, for the State, testified in substance: That he was assistant chief of police of the city of Dallas on and prior to the 24th of May, 1892, when Policeman Brewer was killed. J. C. Arnold was chief of police, but was absent from the city and State at the time, and during his absence witness was acting chief, and the police force of the city was subject to his orders. On the 23d of May, 1892, the day before the killing, witness learned from Policeman Estell that a complaint had been made before the county attorney against Henry Miller and one Wylie Skelton, charging them with slander, and that the State authorities wanted the defendant. Witness thereupon on the same day gave orders to the police force, including policemen Brewer, Brandenberg, and Beard, to arrest the defendant and bring him to witness.

Cross-examined: This was the only authority they had for his arrest. The order was verbal. They were not ordered to arrest Skelton. Skelton was a white man. The defendant was a negro. Skelton lived in the city and was engaged in business. He was a saloon keeper. The defendant also lived in the city. Witness does not know in what business he was engaged at the time, but just previous had been a porter in the employ of the McCroskey Hardware Company.

The testimony of Dean Arnold was as follows: I am keeper of the police station house in the city of Dallas. I know the defendant. About three weeks before the killing defendant was in my office at the city hall building, and was speaking about the times he had been arrested. He said, that with every officer who gave him bond and took his recognizance it was all right, and he would be there the next morning, but if he would not be allowed to give bond, and had a gun with him, he'd be damned if the fight wouldn't begin right there. He made similar statements to me in the past year.

[We deem it unnecessary to set out any of the other testimony of the witnesses.—REPORTER.]

The affidavit, or complaint, charging appellant and another with slander, and upon which complaint a policeman had arrested him at the time of the homicide, and the introduction of which in evidence was objected to by defendant, is as follows:

"*The State of Texas, County of Dallas.*—Personally appeared before the undersigned authority Michael Farrell, who, after being duly sworn, deposes and says, that Wylie Skelton and Henry Miller, in the county of Dallas and State of Texas, on the 20th day of May, 1892, did orally falsely, maliciously, and wantonly impute to a female in this State, to-wit, Mary Farrell, a want of chastity, to-wit, the said Wylie Skelton and Henry Miller did then and there, in the presence and hearing of G. E. Cornwell and divers other persons, falsely, maliciously, and wantonly say of and concerning the said Mary Farrell, that he, the said Henry Miller, went to the room of affiant, and affiant gave to him, the said Henry, $2 to go to bed with his, affiant's, wife; and that the said Henry Miller then and there had carnal knowledge of her, the said Mary Farrell, three different times; and that the said Mary Farrell did then and there commit an unmentionable crime against nature on him, the said Henry Miller. Contrary to the form of the statute in such cases made and provided, and against the peace and dignity of the State.

[Signed]                                              "M. FARRELL.

"Sworn to and subscribed before me, this 23d day of May, 1892.

[Signed]                    "D. A. WILLIAMS, County Attorney."

After the court had permitted this affidavit to be read in evidence, the court subsequently withdrew it from the consideration of the jury, and instructed them verbally and in writing to disregard it as any evidence in the case.

*J. C. Kearby, Bassett, Seay & Muse* and *S. H. Russell*, for appellant.

1. The court erred in overruling the defendant's motion for new trial, on the grounds that the conviction was not supported by the evidence.

(1) The conviction for murder in the first degree is not supported by

the evidence, in that it appears that the defendant was not of sedate and deliberate mind at the time of the homicide.  McCoy's case, 25 Texas, 37; Farrar's case, 42 Texas, 271; Burkhard's case, 18 Texas Ct. App., 599.

(2)  The illegal arrest and attempted recapture, coupled with the deadly assault by the officers upon the defendant while in flight, under the facts of the case, preclude the existence of express malice.

2.  The court erred in admitting in evidence, over the defendant's objection, the affidavit set out in defendant's bill of exceptions No. 7, charging defendant and another with slander, and the testimony of the witness Williams in relation thereto; and the testimony of the witnesses Cornwell, Brandenberg, Beard, Scherrer, Durham, and Arnold, set out in the same bill, in relation to the authority under which the defendant was arrested preceding the homicide, and his declarations prior and subsequent thereto.

The defendant objected to the admission of said affidavit in evidence, on the ground that the same was incompetent and irrelevant, and calculated to prejudice the defendant with the jury; and that it had no force or efficiency until it should be filed, and could not, in any event, operate as a warrant of arrest, or supply the lack of such warrant; and because it appeared upon the uncontradicted evidence of the State's witness Green Williams that he had no authority to take said affidavit, and that the same was void.  No capias had been issued thereon, and the same was filed subsequent to the alleged homicide, and tended to show, if anything, that the defendant was guilty of another offense foreign to that for which he was on trial, and one which was calculated to and probably did arouse the prejudice and resentment of the jury against him.  Willson's Crim. Stats., sec. 2494; Chumley's case, 20 Texas Ct. App., 557; Jones' case, 26 Texas Ct. App., 1; Alford's case, 8 Texas Ct. App., 545; Ross v. Kornrumpf, 64 Texas, 391.

3.  The court erred in admitting in evidence, over objection, the testimony of Cornwell in relation to a charge of slander against defendant, and the testimony of Cornwell, Brandenberg, and Beard as to the authority under which defendant was arrested, in that the same was incompetent and irrelevant and prejudicial to the defendant, and showed no authority for said arrest.  Willson's Crim. Stats., sec. 2499, and authorities cited; Maines' case, 23 Texas Ct. App., 576, and authorities cited; Staples' case, 14 Texas Ct. App., 136.

4.  The court erred in admitting in evidence, over objection, the alleged declarations made to Dean Arnold by the defendant prior to the homicide, in that the statements thereof were general, and were not directed to the deceased, were conditional, and incompetent as tending to show malice; and under some circumstances, and as to an unlawful arrest, was but the expression of the legal right of resistance.  Authorities above.

5.  The court erred in admitting in evidence, over objection, the decla-

rations of the defendant made while under arrest, in that the same were no part of the res gestæ; and defendant was not duly cautioned so as to render such statements admissible in evidence against him. Code Crim. Proc., art. 750; Willson's Crim. Stats., sec. 1046; Stephen's case, 20 Texas Ct. App., 270; Carter's case, 23 Texas Ct. App., 511.

6. The court erred, over exception, in overruling the defendant's application for a first continuance, in that the testimony of the absent witness Brown was material in tending to show defendant's motive in his escape and flight from an illegal arrest, and in firing the shots attributed to him, resulting in the death of the deceased; and in that diligence to secure the attendance of said witness is conceded. Willson's Crim. Stats., secs. 2165–2186; McAdam's case, 24 Texas Ct. App., 86.

7. The court erred in submitting to the jury, over objection, the issues of murder under the facts of the case; and erroneously charged upon and implied the law of arrest, manslaughter, murder of the first and second degrees, and self-defense, as shown by the defendant's bill of exceptions relating thereto; and erred in refusing the several special instructions upon said issues requested by the defendant, as shown in his bill of exceptions in that behalf.

8. The court erred in refusing to submit to the jury only the issues of manslaughter and self-defense, in that said issues alone were presented by the evidence, the homicide being committed in the prevention of an unlawful arrest, under circumstances justifying the same; or at most the homicide was of no higher degree than manslaughter. Code Crim. Proc., arts. 226–231; Jones' case, 26 Texas Ct. App., 10; Alford's case, 8 Texas Ct. App., 545; Ross' case, 10 Texas Ct. App., 455.

9. The charge was erroneous, and not applicable to the facts of the case, in that the evidence presented the following phases of manslaughter:

(a) Lawful resistance of Brandenberg by defendant.

(b) Greater violence than necessary in resistance of Brandenberg.

(c) Abandonment of unlawful assault, if any, on Brandenberg.

(d) Flight by defendant, pursuit and deadly assault by Brandenberg and deceased, resistance of such assault and attempted rearrest.

No charge was given applicable to any of said phases. Willson's Crim. Stats., sec. 985; Howard's case, 23 Texas Ct. App., 265, and authorities cited; Miles' case, 18 Texas Ct. App., 169; Bracken's case, 29 Texas Ct. App., 367, and authorities cited; Bonner's case, 29 Texas Ct. App., 223; Neyland's case, 13 Texas Ct. App., 536; Hobb's case, 16 Texas Ct. App., 523; Alford's case, 8 Texas Ct. App., 545; Ross' case, 10 Texas Ct. App., 455; Staples' case, 14 Texas Ct. App., 136; Jones' case, 26 Texas Ct. App., 1; Code Crim. Proc., arts. 226–232; Ledbetter's case, 23 Texas Ct. App., 247; Muely's case, 26 Texas Ct. App., 274.

10. The charge upon the issues of manslaughter and murder was not authorized by the facts, in that the defendant had freed himself from

arrest and was in flight, pursued by Brandenberg and Brewer with deadly weapons in the effort to recapture him, and in repelling their deadly assault the defendant killed Brewer. Willson's Crim. Stats., sec. 2337, and authorities cited.

11. (1) The evidence fairly raised the issue of self-defense in killing of Brewer, after the defendant's escape from an illegal arrest and while in flight, pursued and shot at by Brandenberg and Brewer in the effort to effect his rearrest.

(2) The evidence further presents the phase of the abandonment of a wrongful assault upon Brandenberg by the defendant, if any, and his flight and the killing of Brewer, while Brandenberg and Brewer were in pursuit, shooting at defendant. No charge was given upon either of the said phases of the case.

(3) The charge erroneously limited the right of self-defense to necessity, and in effect instructed for conviction, unless the killing was necessary, and erroneously failed to charge the law of actual and apparent danger in relation to the acts of Brewer and Brandenberg, and the presumption of law from their use of deadly weapons.

(4) The charge erroneously forfeited the right to defend against Brandenberg or the deceased, Brewer, unless the defendant tried to free himself from such illegal arrest, backing away without offering violence, when the acts of Brandenberg at the time reasonably indicated his intention to kill or seriously injure defendant; and under the charge the subsequent acts of Brandenberg and the intervention of the deceased, Brewer, in the attempted rearrest of the defendant, and shots fired at him, conferred no right of self-defense.

(5) The charge erroneously failed to instruct the jury, that the defendant had the right to escape from the illegal arrest, and what force he might lawfully use to that end, and that he would be justified if pursued and shot at by Brandenberg or the deceased, Brewer.

(6) The charge erroneously hinged the right of self-defense to the repelling of threatened danger from Brandenberg, and ignored and denied the right to defend against the independent deadly assault of Brewer, and erroneously failed to charge in relation to the legal presumption from the use of a deadly weapon by Brewer in the attempted rearrest of the defendant.

(7) And erred, under the facts of the case, in confining and limiting the legal presumption of Brandenberg's intent from the use of a deadly weapon, and to the fact that he first drew his pistol, and in not charging the jury that neither Brandenberg nor Brewer had the right to shoot at the defendant to effect his arrest.

(8) The charge on self-defense was restrictive and not affirmatively applied, and of itself and in connection with the paragraphs hereinbefore excepted to, was a practical denial of the right of self-defense.

The defendant at the time of the trial requested the court to give written charges upon the law of self-defense, which the court refused to do, and the defendant duly excepted.

12. (1) The charge erroneously limited self-defense to necessity, and confined it to an attempted escape, without offering violence, from an illegal arrest; and erroneously justified the homicide in the event only of a serious or deadly assault from Brandenberg or Brewer opposing such character of attempted escape. Willson's Crim. Stats., sec. 986; Orman's case, 22 Texas Ct. App., 604; Hunnicutt's case, 20 Texas Ct. App., 632; Jones' case, 26 Texas Ct. App., 1; Ledbetter's case, 23 Texas Ct. App., 257; Muely's case, 26 Texas Ct. App., 307, and authorities cited under second subproposition.

(2) The charge erroneously failed to instruct what force the defendant might lawfully use to escape from illegal arrest, and failed to apply the law of self-defense affirmatively to the several theories raised by the evidence, viz., an escape and a deadly assault by Brandenberg and Brewer in an attempted recapture; flight and the abandonment of a wrongful assault upon Brandenberg, if any, in the effort to escape; pursuit and deadly assault by Brandenberg and Brewer in the attempt to recapture. And erroneously failed to charge upon the presumption from the use of a deadly weapon by Brewer. Willson's Crim. Stats., secs. 2336, 2338, 1756; Kendall's case, 8 Texas Ct. App., 569; Bell's case, 20 Texas Ct. App., 450; Jones' case, 17 Texas Ct. App., 612; Cartwright's case, 16 Texas Ct. App., 487.

(3) The court erred in refusing the defendant's several requested charges upon the law of arrest and self-defense, supplying in effect the omissions in the charge of the court pointed out in the third subproposition.

[The attorneys above named for appellant also filed, in connection with their motion for rehearing, a most able, earnest, and exhaustive brief and argument upon the facts and law of the case, which we regret our inability to report for want of space. The motion for rehearing was overruled at the Austin Term, June 13, 1893.—REPORTER.]

*R. L. Henry*, Assistant Attorney-General, for the State.

DAVIDSON, JUDGE.—Appellant prosecutes this appeal from a conviction of murder in the first degree, with the death penalty assessed.

1. When the cause was called for trial, he applied for a change of venue, based upon both grounds mentioned in the statute. To this application was attached an exhibit—a newspaper account of the actions of a mob which sought to take defendant from custody for the purpose of hanging him. The controverting affidavit filed by the State was sufficient, both

as to form and substance; wherefore the court did not err in overruling defendant's exceptions to the same. Willson's Crim. Stats., secs. 2209, 2210. The application was refused, and defendant excepted, but the evidence adduced on the trial of the issues involved in the motion is not incorporated in the bill of exceptions; and it is therefore insufficient to authorize, on appeal, a revision of this ruling of the court. Code Crim. Proc., art. 584; Blackwell v. The State, 29 Texas Ct. App., 194; Lacy v. The State, 30 Texas Ct. App., 119. Attaching the newspaper account to the application as an exhibit does not authorize its consideration as evidence in support of such application. Lacy v. The State, Id.

2. Defendant sought a continuance; first, because there existed a prejudice so great and a combination of influential persons so strong, that he could not obtain a fair and impartial trial in Dallas County; and second, for the testimony of one Brown, by whom he " expected to prove, that a few nights prior to the homicide several policemen with others came to his house in the city of Dallas, and then and there talked with said Brown, and inquired of said witness the whereabouts of defendant, and said they proposed to arrest defendant, and that he would then be killed by some man who they then named to said witness." The application fails to show diligence to secure the attendance of the witness. Defendant was served with a copy of the indictment on June 9, and his trial occurred July 14 following. The process for the witness is not attached to the motion, nor is it inserted in the bill of exceptions, and neither states the date of its issuance, nor is it shown that further process was not required. But if diligence be conceded, the allegations are too vague and indefinite. Neither the name of defendant's proposed slayer, nor that of any of the parties who visited his house, is given. Nor would the testimony as set out be admissible. General statements will not suffice, nor will mere inferences or indefinite allegations. The facts expected to be proved must be stated definitely. Miller v. The State (Texas Crim. App.), 20 S. W. Rep., 1103; Williams v. The State, 10 Texas Ct. App., 114; Grissom v. The State, 8 Texas Ct. App., 386; Thomas v. The State, 17 Texas Ct. App., 437; Mitchell v. The State, 1 Texas Ct. App., 195.

3. This homicide occurred on May 24. The State, over defendant's objection, was permitted to prove that an affidavit was prepared on May 23, and filed on May 25, charging defendant with the offense of slander; that the acting chief of police was informed of that fact; that he instructed the police force to arrest defendant; that in obedience to this order he was arrested, and this constituted the only authority for his arrest. This testimony was objected to because irrelevant and incompetent. The effect of this testimony was to show the arrest without warrant, and thus it tended to maintain the defensive theory of illegal arrest, and for this purpose was legitimate, and did not, because offered by the prosecution, become incompetent.

4. The affidavit charging defendant with the offense of slander was also admitted in evidence. The slander charged imputed to the female mentioned a want of chastity of a most revolting nature. The contents were hardly germane to any issue in the case, in the absence of evidence bringing home knowledge to defendant of the existence of the affidavit, and we are not prepared to say that it may not have prejudiced defendant in the minds of the jury. The court, however, subsequently withdrew the affidavit from the consideration of the jury, and instructed them verbally, as well as in writing, to disregard it as evidence in the case.

The effect of withdrawing and excluding testimony erroneously admitted, which was or may have been prejudicial in its nature and tendency, has been the subject of much discussion in the courts, and the decisions are not harmonious upon the question. The weight of authority, however, seems to be that such withdrawal cures the error, and such has been the opinion entertained by this court. Sutton v. The State, 2 Texas Ct. App., 342; Marshall v. The State, 5 Texas Ct. App., 273; Phillips v. The State, 22 Texas Ct. App., 139; Nalley v. The State, 28 Texas Ct. App., 387. See also, State v. Fowler, 13 R. I., 661; Thomp. Trials, secs. 715, 722, 723, and notes.

In Sutton's case, supra, it was said: "But conceding the court erred in admitting this testimony, the error, if in fact any was committed, was corrected by the court afterwards withdrawing it from the considertion of the jury." This ruling has been approved in subsequent cases, and the doctrine uniformly upheld, that when improper evidence has been admitted over objection, it is the proper practice, and may become the duty of the court, to exclude or withdraw it from the jury, and instruct them to disregard it in finding their verdict. Authorities above cited; Willson's Crim. Stats., sec. 2514.

To hold otherwise would be to sanction the doctrine that the court could not cure any error into which it may have fallen by mistake or inadvertence, and thus render it helpless to rectify errors committed, and the trial a mockery and a farce. We can not sanction such a doctrine. It is not intended here to hold that cases may not arise in which the withdrawal of testimony would not cure the error committed in admitting same; for it may occur that such evidence was of such a prejudicial character as to so influence the jury against the defendant that he would be deprived of a fair and impartial trial. We do not think, however, this evidence of that character.

5. The State proved by Arnold, that about three weeks prior to the killing, defendant, speaking of his previous arrests by deceased and other policemen, said "that every officer who gave him bond or took his recognizance, it was all right, and he would be there the next morning; but if he would not be allowed to give bond, and had a gun with him, he would

be damned if the fight didn't begin right there. He made similar state-
ments to me repeatedly in the past year." Objections were urged, that
this testimony was irrelevant, showed no malice towards deceased, and
tended to confuse and mislead the jury. Deceased was a policeman, was
specially mentioned by defendant in connection with his previous arrests
and conditional threats, was connected with the arrest of defendant just
preceding the homicide, and was seeking his arrest at the time he was shot
and killed. The evidence was directly pertinent to the issue of malice
and motive. Campbell v. The State, 15 Texas Ct. App., 506; McKinney
v. The State, 8 Texas Ct. App., 626; Hubby v. The State, Id., 597; Will-
son's Crim. Stats., secs. 1043, 1044.

6. While under arrest, and within fifteen minutes after the homicide,
being informed of Brewer's death, defendant told some one in the crowd
near him to "Tell Sam Miller to come down here; by God, I have got
my man!" It was objected, that defendant was under arrest, was not
cautioned or warned, and was in fear of his life. The testimony was res
gestæ and properly admitted. Lewis v. The State, 29 Texas Ct. App.,
201; Fulcher v. The State, 28 Texas Ct. App., 465; Castillo v. The State,
ante, p. 145; Powers v. The State, 23 Texas Ct. App., 42.

7. Error is assigned because the court charged the jury as to the law
applicable to murder in the first and second degrees, and refused to con-
fine their consideration of the case to the issues of self-defense and man-
slaughter. In this connection the evidence discloses that defendant, about
three weeks prior to the homicide, and on several previous occasions,
alluding to his "many arrests," said that deceased and other policemen
had given him bail, but if, upon future arrests, they should refuse to
take his bond or recognizance, he would have his pistol and "he would
be damned if a fight did not commence, and he would never be carried
to the jail alive." When arrested at the railroad depot, shortly before
the homicide, he assented and willingly accompanied the officers to Lacy's
saloon, on the opposite side of the street. Deceased participated in this
arrest, but did not accompany the parties to the saloon, and was not fur-
ther connected with his detention. While in the saloon, Beard, one of
the policemen making the arrest, having telephoned for the patrol wagon,
refused defendant's request for bail because he "did not know exactly
what the charge against him was, and Ed Cornwell (chief of police) had
told him to bring him to the police station," and also said to defendant,
"Go and see Ed, and it will be all right."

Anticipating no trouble, Beard left the defendant in the saloon, in the
custody of another policeman, Brandenberg, who, upon two similar re-
quests, refused to release defendant on bond. Upon the last refusal, and
while Brandenberg was engaged in conversation with another party, de-
fendant drew his pistol, leveled it at the officer's face, remarking as he
did so, "By God, here's my bond," or "By God, I will have bond,"

and jumped or backed out of one door as the officer went out of another. Just as they emerged from the doors, defendant shot at Brandenberg, who then drew his pistol. Defendant began retreating and firing, and as he fired the third shot, Brandenberg fired at him. After the firing began, deceased, who was standing some distance away, started in pursuit of defendant for the purpose of arresting him; and as he approached, defendant turned upon, and, supporting his right arm with his left, fired at and killed him. He then continued to retreat and shoot at Brandenberg until his pistol was entirely discharged. In a few moments he was arrested, and from him was taken a pistol and twenty-two cartrides, with six of which he was seeking to reload his pistol. Deceased's pistol was discharged as he fell or was falling, and the evidence is conflicting as to whether he fired at defendant prior to being shot. Shortly after his arrest, upon being informed of Brewer's death, defendant said to a bystander, "Tell Sam Miller to come down here; by God, I have got my man!" Sam Miller and defendant are brothers. The evening train had just arrived and was at the depot. The street was filled with people, and the firing occurred near the depot, one ball striking the engine.

Where a party is illegally detained he may, in a proper manner, regain his liberty, and a killing under such circumstances may be reduced to manslaughter, or self-defense. But if the killing be for any other cause, as ill-will or malice, it will be murder; or if more force than necessary be used, or a deadly weapon be resorted to unnecessarily in the first instance by the arrested party, this would constitute him the aggressor. Code Crim. Proc., arts. 83, 84; Stockton v. The State, 25 Texas, 776. If his intention was to kill or do serious bodily harm, the killing would be upon express malice. He is not required to submit to illegal arrest, but may demand the warrant or proper authority, and in its absence repel force by force, provided the force does not exceed prevention and defense. Such force, however, can not be disproportionate to the injury. The right to repel force by force continues until the person attempting the illegal arrest presses forward with such violence that the person defending is obliged to choose between three things; to retreat, to surrender, or the death of his adversary. If the force used be disproportionate to the injury about to be inflicted, self-defense is eliminated; and if it be attributed to any other cause than resistance to the illegal arrest, such arrest can not be looked to as a mitigating circumstance. It has been said that " In such cases it may be well deserving of consideration whether the first inquiry ought not to be whether the act done was caused by illegal apprehension. If the act done arose from other causes, and had no reference to the illegal arrest—as if it arose from previous ill-will—it would seem that the illegality of the arrest ought not to be taken into consideration, because it was not the cause of the act, and therefore could not be truly said to have offered any provocation for it." 1 Am. and

Eng. Encyc. of Law, 573, and notes; see, also, Ex Parte Sherwood, 29 Texas Ct. App., 334; Miller v: The State (Texas Crim. App.), 20 S. W. Rep., 1103.

The question at last is, what cause, reason, or motive actuated the defendant in committing the homicide? It is the settled law of this State, that in arriving at a correct conclusion in homicide cases, the killing should be viewed from the defendant's standpoint; that is, to ascertain as nearly as possible, from the evidence, the reasons and motives which moved or induced the accused to do the killing. It has been held, that an unlawful arrest is esteemed, in law, a great provocation. If it be conceded that such provocation constitutes "adequate cause," under our statute, then, in order to reduce the killing to manslaughter, "sudden passion" must have existed in the mind of the slayer at the time of the homicide; otherwise, the killing would be murder. Massie v. The State, 30 Texas Ct. App., 64; Ex Parte Jones, ante, p. 422; Ex Parte Sherwood, 29 Texas Ct. App., 334; Miller v. The State, 20 S. W. Rep., 1103. Such provocation, in the absence of "sudden passion," may become evidence of a most cogent character and force, showing malice. (Same authorities.) Again, if there exists a provocation unknown to the accused at the time of the homicide, this would not suffice to reduce the killing below murder. There must be a concurrence of "adequate cause" and "sudden passion," as defined by our statute, to reduce a felonious homicide to the degree of manslaughter.

As was said by Judge Hurt in Dyson's case, 14 Texas Court of Appeals, 454: "When the prisoners have been sometime in custody, and the informality of the warrant under which they were held was unknown to them, and they deliberately planned and carried out an attack which resulted in the death of one of the officers, this was held murder, and not manslaughter." And again, in Sherwood's case: "Because without such knowledge the provocation could have no effect upon him whatever, and hence without such knowledge it is absolutely certain that his passions, if any, were not caused by this provocation." 29 Texas Ct. App., 334. This court has further held, that where a party, "expecting an attempt will be made to arrest him illegally, deliberately prepares arms for immediate use, and calmly and deliberately determines to kill the person attempting the illegal arrest, and upon his appearance for that purpose does kill him, such killing would be upon express malice; and to hold the slayer guilty upon express malice would not only be law, but common sense and justice" Miller v. The State, 20 S. W. Rep., 1103. Illegal or attempted illegal arrest, unlawful restraint of liberty, and a wanton, unnecessary, and unjustifiable exercise of legal power in making arrest, stand upon the same legal plane. Ex Parte Sherwood, 29 Texas Ct. App., 334; Miller v. The State, 20 S. W. Rep., 1103; Horr. & T. Cas. Self-Def., 715.

In this case defendant had been "many times" arrested by deceased and other policemen of Dallas, had always submitted, because bail was accorded, and would do so again upon the same conditions, but should this be refused, he had deliberately resolved, and so notified the officer, to bring on a deadly conflict, and one in which his own or the life of the officer was to be sacrificed.    In this connection, and upon this stated condition, the life of deceased had been threatened by defendant; and when the opportunity came he was armed, and brought about the conflict.   The drawing and presenting his pistol was an unnecessary and an illegal act, and disclosed his purpose to execute his previous threat.   He was in no danger from the officers, or any other source, and could have secured bail by accompanying the officers to the police station.   Deceased was not connected with the difficulty in the saloon, and was seeking defendant's arrest when shot and killed by him.   Defendant was violating the law of the State in carrying the pistol, presenting it, and shooting at Brandenberg, as well as subsequently firing it in the street; and he was aware that it was incumbent upon deceased, as an officer, to arrest him for these offenses, and a duty which if left unperformed would subject the officer to a heavy penalty and a severe punishment.

But there seems to have been another reason operating upon defendant's mind, inciting him to take the life of Brewer, as evidenced by the deliberate manner of shooting him, as well as the message sent his brother immediately after the homicide.   That message conveys the idea that deceased had been the subject of discussion between the brothers; that they understood each other in regard to defendant's feelings and intentions toward deceased; and the inference is strong, if not conclusive, that the brother would know, without mentioning his name, that deceased was the "man" referred to in the message.   The evidence does not sustain the position that defendant knew he was illegally arrested, nor was that matter ever referred to by him.   He voluntarily and willingly submitted to the arrest, said it was "all right," and at no time questioned the officers' right to make the arrest, nor demanded their authority for doing so, but only claimed the right to give bond, and thus not only recognized their right to make the arrest, but manifested as well his belief that his arrest was legal.   His mind was unmoved by reason of the arrest.   He believed it legal, and willingly remained in custody for ten or fifteen minutes, and until bail was refused the third time; and reviewing his acts in the light of all the facts, he did so, waiting for the opportune moment to shoot, either because he was denied bail on the spot, at the instant, ar 1 on the terms fixed by himself (not because he was refused bail at all events), or because there existed in his mind a purpose to kill, formed prior to the arrest, as indicated by facts anterior to, occurring at the time of, and subsequent to, the homicide.   Being the aggressor, he brought on a conflict in which he knew or believed life must be sacrificed,

and from that instant till the firing ceased his attitude in the difficulty never changed.

Viewing this transaction from the defendant's standpoint, as evinced by his acts and declarations, it appears that he had frequently been arrested by deceased and other policemen; that he had heretofore been admitted to bail; that he anticipated refusal of bail, if again arrested; that he threatened to be armed, and bring on a combat with deadly weapons, in case he was not permitted to give bond when arrested; that the legality or illegality of the anticipated arrest had no connection with his threats; that he assented to his arrest, and did not inquire the cause, or demand the authority of the officers making it; that he deliberately armed himself with a heavy-caliber pistol, as he had threatened; that he also secured and carried about his person twenty-two extra cartridges; that thus armed, he went to the place at which deceased and the other policemen were on duty on the occasion of the homicide; that he was immediately arrested by the policemen; that he demanded and was refused bail shortly after his arrest; that he drew his pistol and fired at Brandenberg when bail was refused; that he turned from firing at Brandenberg and fired at deceased; that he was deliberate in his manner of shooting at and killing deceased; that he sent the message, "Tell Sam Miller to come down here; by God, I have got my man!" to his brother just after the homicide; that he had prior unkind feelings and ill-will towards deceased; and that he was reckless and desperate of human life in his conduct throughout the difficulty. The court, therefore, did not err in charging the law applicable to murder of both degrees, and in refusing to confine and restrict the deliberations of the jury to manslaughter and self-defense.

We deem it unnecessary to discuss the other questions relating to the charge. Under the principles announced in the cases of Ex Parte Sherwood and Miller v. The State, above cited, we are of opinion that the judgment should be affirmed, and it is so ordered.

*Affirmed.*

Simkins, J., concurs.   Hurt, P. J., dissents.