## CHARLES THOMPSON v. THE STATE.

*No. 271. Decided April 25.*

1. **Murder—Accomplice Witness—Charge—Circumstantial Testimony.—** On a trial for murder, where an accomplice eye-witness swears directly and positively to the facts of the killing, and the evidence further shows threats of defendant to kill the accomplice in case of betrayal by her, *Held*, that the case was not one of circumstantial testimony requiring the court to charge on circumstantial evidence.

2. **Charge—Special Instructions.—** It is not error to refuse special requested instructions where the law of such instructions is fully submitted in the general charge.

33  217
37  509

3. **Continuance—Sufficiency of—Practice on Appeal.**—An application for continuance must show diligence; the testimony expected to be proved must not be stated in vague and general terms; it must be pertinent and material to the issues in the case. But if it be conceded that an application is good in each of these particulars, still the court, on appeal, will not reverse for error in overruling it if the facts stated are such as, in the light of the record, do not require a reversal, and especially so where it is shown that the material facts alleged could have been proved by witnesses present.

4. **Bill of Exceptions—Indefinite, When.**—A bill of exceptions reserved to evidence is too indefinite to be considered if it fails to show that the evidence was produced before and went to the jury. Following Burke v. The State, 25 Texas Crim. App., 172.

5. **Evidence—Bloody Clothing—Codefendants—Accomplice Testimony.**— Where the evidence discloses that defendant and another acted together in the perpetration of the murder, bloody clothing taken from the possession of the codefendant the day after the murder is admissible evidence against defendant, and especially so where it is corroborative of the testimony of an accomplice inculpating such other party in the murder.

6. **Jury Law—Special Venire—Practice.**—It is provided by statute (Code Crim. Proc., arts. 611, 612), that when the special venire is exhausted the court shall order the sheriff to summon from the body of the county any number of persons it may deem advisable for the formation of the jury, and a defendant has no right to demand that the regular panel for the week be placed in the jury box from which to complete the panel. Following Weathersby v. The State, 29 Texas Crim. App., 278.

7. **Murder of First Degree—Evidence.**—See facts which in the opinion of the court are amply sufficient to support a conviction for murder of the first degree, with a life term in the penitentiary.

APPEAL from the Criminal District Court of Harris. Tried below before Hon. E. D. CAVIN.

Appellant, Charles Thompson, was jointly indicted with one John Peterson and one John Williams for the murder of one W. O. Ball, in the county of Harris, on the 28th day of January, 1893.

On motion of defendants John Peterson and John Williams a severance had been granted to each of them respectively, and each of them had been tried and acquitted previous to the calling of the case for trial against this appellant.

Appellant made a motion for continuance, which was overruled, and his trial having been proceeded with, resulted in a conviction for murder in the first degree, with imprisonment for a life term in the penitentiary.

Deceased, W. O. Ball, was a telegraph operator on the Southern Pacific Railroad, and had his time check for services paid on Saturday, January 28. At the time he was paid a man was seen close by who resembled the codefendant John Williams. Thompson, Peterson, and Williams were seen frequently together on the evening before the killing. They, together with Ball and two women, Josie Gibson and Julia Whitten, were in Dixon's saloon, in the wine room, between the hours

of 9 and 10 o'clock p. m.    Between 9 and 10 Ball, who was then drunk
and getting the witness Drone to buy him a bottle of whisky, started
off, saying he was going to bed.    About 12 o'clock his body was dis-
covered lying on a little bridge near a stable, on Louisiana street.

The facts immediately connected with the killing are fully stated in
the testimony of Julia Whitten, an accomplice, most of which is re-
produced, as follows: "I know Charley Thompson; he lived with me.
On the night of January 28, 1893, he came to me about 8 o'clock and
asked me for the keys to my bureau drawer.    I was in Nick Moore's
saloon.    I asked him what he had in the bundle, and he told me,
'None of my damned business.'    I went to the house with him, and
he opened the middle bureau drawer and put the bundle in it.    I saw
that it was new men's underwear.    I went back to the saloon, and he
came to me and said, 'Julia, I've got a sucker on the string, and by
God I am going to work him.'    I walked around awhile, and some-
time after 10 o'clock came back to Nick Moore's.    Thompson, Peter-
son, and Williams came there with Ball somewhere about half-past 10.
Williams and Ball stood at the corner and Thompson took me to one
side, near a little kitchen, near Nick Moore's, and said, 'That man's
got money, and if you don't get it I will, if I have to kill him.'    I
took Ball to my room and he gave me $2 to stay with him for awhile.
We undressed and went to bed.    After a little Charlie Thompson
came to my door and knocked, and I told him he could not get in.    He
left, and Ball and I got up and dressed.    Just as we finished dressing
Thompson knocked at the door again, and I again told him he could
not get in.    He broke open the door and said to Ball, 'You have
staid with my woman, and by God I want money for it.'    Ball re-
plied, 'You can't get it.'    Then Thompson struck him on the head
with a flat bar of iron, which I had used to prop up my window.    It
was about as thick as one of my fingers and about an inch and a half
wide.    Ball had one arm in his coat sleeve and was just putting the
other arm in.    When he struck him Ball cried, 'O! God, don't.'    The
blow knocked him to the floor, and Thompson jumped on him.    Peter-
son then came in from the shed through which Thompson had come,
and seized a hatchet which I had borrowed from Nick Moore's to nail
up my door, and which was lying near the door.    He handed it to
Thompson, who struck Ball over the head with it and then handed it
back to Peterson, who struck Ball twice with it.    Ball was struck two
or three times with the hatchet and twice with the bar of iron.    When
Thompson got off of Ball he took the bar of iron, and saying, 'Dead
men tell no tales,' struck him again on the head.    When Thompson
first struck Ball I jumped over them and ran into the shed.    Williams
was there, and he held me and kept me from leaving.    I screamed and
asked him to stop them, but he would not.    Peterson and Williams
and Thompson then took the body out through the back yard and laid

it behind a water closet. There they went through him, took his money from his body, and then came back into my room and counted the money on my dresser. I was outside, but could see them through a window next to Nick Moore's. When they had finished counting the money, I heard Thompson say, 'Two hundred and seventy dollars.' I knew Ball had considerable money, because he showed me a roll of it. They then put the money in a yeast-powder can. It was a light night, and I could see them when they went through Ball. They left the house and went and got the body and placed it in Dago Joe's wagon, which they secured across the street. Peterson and Williams picked up the body and put it in the wagon. All three then carried it up Louisiana street and I followed them. They did not have a horse; they pulled the wagon themselves. I saw them place the body on a little bridge, where it was afterwards found. Thompson then left them and carried the piece of iron towards the old mattress factory. There I saw him throw something in the bushes, but don't know what it was. I returned before he did, and saw them scrub out the wagon. Then they came and scrubbed out my room. That is Thompson's handkerchief [pointing it out in court], and that is blood on it. Those are his keys [pointing to bunch in court], and that is the hatchet [pointing] which was used. I saw Peterson next morning. He took a bundle from under Nick Moore's closet. It was not well wrapped up and fell apart, and I saw it contained two bloody shirts. One was Thompson's shirt, a red striped one, and the other was Peterson's. He went away with them. In regard to the two statements made by me in regard to the murder of Ball, I will say that I made the first through fear for myself. I thought that if I told that the murder was committed in my house I would be hanged. In my second statement they put in some things which I did not tell them to put in at all. I can neither read nor write. W. O. Ball was killed in the manner I have described, in my room, in Houston, Harris County, Texas. Charles Thompson struck him the first blow with the bar of iron, then he struck him with the hatchet; then Peterson struck him twice with the hatchet and Thompson struck him with the bar of iron. Ball was struck five times in all on the head—three times with the hatchet and twice with the bar of iron. I was in the shed when all this was going on. Williams held me by the arm right by the door, where I could see it all. I called for help and asked him to stop the fuss. I did not see Peterson and Williams that night until they brought Ball there about 10:30 o'clock. I am positive about this. I was at Nick Moore's corner at about 8 o'clock. Do not know where I was at 8:30 o'clock or 9 o'clock. I did not see Peterson or Williams again that night after the murder was committed, and after they had scrubbed the wagon and my house. I took Ball into the house by the back door; the front door was locked and Josie had the key. I

do not know who placed that bloody sheet back of Nick Moore's. I did not do it. I had no sheet on my bed; they were in the wash. Ball did not fall on the bed when he was struck, and there was no blood on the bed. Josie Gibson is dead; she killed herself in my room at the police station. She was a large woman, and would weigh about 150 pounds. I was not at Dick Dickson's that night with Josie and W. O. Ball. I did not drink with him there. I got him at Nick Moore's corner. The next morning Thompson 'changed his shirt in my shed room; it had blood on the cuffs and bosom. I followed them out to where they robbed the body. Am somewhat near-sighted, but I was close enough to see what they were doing. The moon was up that night, but it was cloudy; but I could see every move they made. After they robbed the body and counted the money. they got the Dago's wagon, across the street, and carried the body in it. I followed them up to where they put the body. That was about three blocks. Then Charley Thompson went down Rusk street to the mattress factory and threw the bar of iron into the brush. I was about a block away from him when he threw the bar of iron into the brush. I could not see the bar of iron, but I saw him start off with it and saw him throw something into the brush, and hence I say he threw the bar of iron in there. After Thompson came back the men washed the wagon.. I am positive it was Dago Joe's wagon, and that they washed it. I do not know where Josie was when Ball was killed. She was not in her room. The next morning after the murder Thompson came to me and told me if any one asked me where he was during that night that I should tell them that he staid with me, and he threatened me if I did not do so. I have heretofore made two written statements about the murder of Ball."

Alex Erichson, whose testimony was objected to by defendant as to the handkerchief and coat found on the person of Peterson, and also the bloody shirt and towel taken from the possession of Williams the day after the murder, testified: "I went to the scene of the murder on Sunday morning, January 29, 1893. Thompson, Peterson, and Williams were hanging around there. Thompson told me that he had slept all night with Julia Whitten in her house. I went to the door of Julia's room and knocked and demanded admittance. The door was fastened. The floor of her room had been recently scoured, and water was standing in low places in the floor. On the outskirts of the wet places we found evidences of blood stains. There was also a little clot of blood on the door jamb of the front room, which was Josie's room, and a few drops on the front steps. We found several bunches of keys, that broom [pointing to broom], which was wet and had blood-stains on it; that sack [pointing to sack], which had apparently been used to wipe up the floor; a bloody handkerchief; that bloody woman's apron [pointing them out], and that black skirt, which had some blood-

stains on it, but I can not swear that the stains were blood. Those two handkerchiefs [pointing] were found on Peterson. They have what looks to be blood on them. This coat [pointing] was one that Peterson had on when he was arrested soon after Ball was killed. It had blood-stains on the inside of the sleeve, near the hand. He said that he had recently been bitten by a dog on the hand, and thus the blood-stains came on the coat. The black skirt with stains on it was found in .Josie Gibson's room. When Williams was arrested he was in his undershirt, and I found this shirt and towel [pointing to them] in his pocket. They were wet, and there were stains on the shirt and towel that I judged to be blood. Some spots of blood were found on Nick Moore's steps, but it was old blood and had nothing to do with this case. There was a little blood-stain on the sill of the door between .Julia's and Josie's rooms. I have never used any influence to get Julia to testify in this case against the defendants or to make any statement implicating them. I told her when she decided to make a statement, for God's sake not to implicate an innocent man. I believed she was as guilty as anybody, and I told her if she would tell the whole truth I would protect her. I have given her whisky, and I did tell the defendants that I would break their damned necks. A burnt sheet was also found back of Nick Moore's. There were stains on it that looked like blood-stains. I told each of the defendants separately that the others had laid the blame on him. I told the woman the same thing. When Julia Whitten made her two written statements they were read over to her in my presence.''

It is unnecessary to give any further statement from the facts, further than to remark, that though Peterson and Williams, the codefendants, had been previously acquitted, they were not called by defendant to ·testify in his behalf.

No brief has come to hand for appellant.

*R. L. Henry,* Assistant Attorney-General, for the State.

DAVIDSON, JUDGE.—This is a conviction of murder in the first ·degree, the punishment being assessed at a life term in the penitentiary. The evidence does not bring this case within the rule of circumstantial evidence. The accomplice swears directly and positively as eye-witness that defendant committed the murder. The threats of defendant to kill the accomplice if she betrayed him were also proved. ·The court did not err in refusing the requested charge submitting the law applicable to circumstantial evidence.

Nor did the court err in refusing defendant's requested instructions in regard to the testimony of the accomplice and necessary corroboration. The-charge given by the court fully submits the law applicable

to this phase of the case.   It is not error to refuse special instructions, though they embody correctly the law, if the charge given the jury presents the law controlling the subject matter of such special instructions.   Willson's Crim. Stats., sec. 2254.   The charge as given is not a charge on the weight of the testimony, and we think it an admirable presentation of the law of the case.

The application for continuance was correctly refused.   We deem the diligence wholly insufficient.   But if it be conceded we are in error in this position, then the stated facts are not of that character, when viewed in the light of the record, which requires a reversal of the judgment.   The testimony expected to be proved by the absent witnesses, much of it, is too generally and vaguely stated to require notice.   Some of it is in relation to matters about which there was no issue, and all that part of the testimony relating to the actions and whereabouts of the codefendants Williams and Peterson could have been shown by them, the said Williams and Peterson, had the defendant desired their testimony.   They had both been acquitted and were present to testify for defendant on the trial.   The evidence shows very strongly that the three men were together on the night of the homicide and the next morning, and the accomplice is strongly corroborated in her testimony that the three committed the murder.   If they were not participants, and were not with defendant at the murder, they could have so stated.   The defendant should have used all the testimony favorable to him at his command.   Why this was not done is not explained.   We deem it unnecessary to go into a further discussion of the application for continuance.

The defendant objected to the request of the State, made by Alex Erichson, to produce some handkerchiefs and a coat found on the person of Peterson the day after the murder, the garments being bloody. Having failed to show the production of the garments in evidence, the bill is too indefinite to be considered.   Burke v. The State, 25 Texas Crim. App., 172; Jacobs v. The State, 28 Texas Crim. App., 79; Jackson v. The State, 28 Texas Crim. App., 143.   This witness was also permitted to testify that a shirt and towel, damp and bloody, were taken from the possession of Williams the day after the murder.   The testimony was clearly admissible.   Williams was shown to have acted with Peterson and defendant in perpetrating the murder, and this evidence was corroborative of the accomplice's testimony that Williams was present at the murder, and assisted defendant and Peterson in carrying off the body.   The wounded man bled profusely.

We do not think the court erred in excluding Fagan's evidence. Lupi had not testified on the trial of Williams and Peterson, and Fagan, one of defendant's counsel, proposed to testify, that he "sent Peterson in search of Lupi to rebut the suspicions raised by the State's cross-examination of Lupi."   How "suspicions raised by the State's

cross-examination of Lupi" could have been suggested before the witness was even known in the case is not easily understood.

Defendant's attorneys "demanded it as a right" that the regular panel for the week be placed in the jury box from which to complete the jury for his trial. This was refused. This ruling was correct. The statute provides, that when the special venire is exhausted the court shall order the sheriff to summon any number of persons that it may deem advisable for the formation of the jury. These are to be selected from the body of the county. Code Crim. Proc., arts. 611, 612; Weathersby v. The State, 29 Texas Crim. App., 278. The evidence amply supports the conviction. The accomplice Whitten is corroborated fully as to defendant's connection with the crime, and as a participant in the murder.

The judgment is affirmed.

*Affirmed.*

Judges all present and concurring.