ROY BENNETT v. THE STATE.

No. 7208.   Decided April 18, 1923.

Rehearing denied June 27, 1923.

1.—Murder—Evidence—Opinion of Witness—Harmless Error.

The physical condition surrounding the scene of the murder indicated by the sheriff was properly received in evidence, but the unauthorized opinion as to the location of the parties was inadmissible. However, in the light of the facts of the instant case the error was harmless.

2.—Same—Evidence—Withdrawal of Illegal Testimony.

Applying the rule touching the withdrawal of improper evidence to the instant case, and in the light of the other facts, the nature of the testimony was not such as precluded the correction of the error in admitting it. Following Miller v. State, 31 Texas Crim. Rep., 636.

3.—Same—Provoking Difficulty—Charge of Court—Rule Stated.

It is true that one may seek another against whom he has a grievance and the fact that he arms himself is not necessarily a provocation placing him in the wrong. In the instant case, however, the long-standing enmity between the parties and the circumstances under which the defendant presented himself, and the time and place selected by him for the interview, etc., brought the case within the rule of provoking the difficulty, and there was no error in submitting this phase of the law in the court's charge on self-defense.

4.—Same—Special Venire—Talesmen.

When the special venire was exhausted, it was proper for the court to authorize the sheriff to summons talesmen, and he did not err in refusing defendant's motion to call the men from the venire for the week. Following Mays v. State, 50 Texas Crim. Rep., 165, and other cases.

5.—Same—Motion to Disqualify Sheriff.

Where appellant filed a motion to disqualify the sheriff from summoning talesmen, and the court heard evidence on said motion, this court is not prepared to say that the trial court was not warranted upon the evidence produced in overruling the motion.

6.—Same—Motion for Continuance—Want of Diligence—Practice on Appeal.

Where a subsequent application for a continuance was made to secure testimony that the deceased had made threats, etc., and there was want of diligence as to all witnesses but one, and this witness's testimony would not have produced a different result, there is no error in overruling same.

7.—Same—Rehearing—Continuance.

We think our former opinion correct in holding that it was not error to refuse a third application for continuance to procure witnesses to testify to threats and abusive language, as there was abundant testimony on this uncontroverted issue.

8.—Same—Opinion of Witness—Evidence.

While we held in our original opinion that the sheriff's statement and his opinion of the location of the parties should not have been admitted, but

held that it was not hurtful as it seemed to coincide with other facts, we must still adhere to this conclusion, and the same is applicable to the testimony and opinion of the physician.

### 9.—Same—Evidence—Circumstantial Evidence.

There appears no error in the admission of testimony of the fact that early the next morning, after the homicide, a witness found three new 12-gauge shotgun shells near the scene of the homicide, under the facts of the instant case.

### 10.—Same—Provoking Difficulty—Charge of Court.

This court after a reconsideration of the record has not been able to conclude, in the face of all of the testimony, that the trial court erred in submitting the law of provoking a difficulty.

Appeal from the District Court of Camp. Tried below before the Honorable R. T. Wilkinson.

Appeal from a conviction of murder; penalty, twenty-five years imprisonment in the penitentiary.

The opinion states the case.

*B. F. Crosby,* and *Florence, Florence & McClelland, C. G. Engledow, J. D. Bass,* and *J. A. Guest,* for appellant.—On question of admitting opinion of witnesses as to the location of parties, Thompson v. State, 17 S. W. Rep., 448; Williams v. State, 17 id., 1071; Champ v. State, 22 id., 678; Cabeness v. State 74 id., 908; Pearson v. State, 120 id., 1004; McCandless v. State, 57 id., 672; Hunt v. State, 225 id., 869.

*R. G. Storey,* Assistant Attorney General, for the State.

MORROW, PRESIDING JUDGE.—The conviction is for murder; punishment fixed at confinement in the penitentiary for a period of twenty-five years. Appellant shot and killed the deceased Mulrein.

From the testimony of the appellant, it appears that there had been ill-will between himself and the deceased of long standing; that the deceased had accused him of various criminal offense and had frequently used abusive language towards him; that according to the information possessed by him, the deceased had on more than one occasion threatened to kill the appellant. Many witnesses for both the State and appellant testified to their unfriendly relations. Immediately before the homicide, he had a conversation with his wife, and taking a gun with him, he went at night to the court house, where the deceased stayed, for the purpose of demanding that deceased refrain from further hostile conduct. What occurred is thus described by the appellant:

" I went in at that door into Mulrein's office. As I entered that door, I spoke to Mulrein, I called his name, I called him 'Mul,' when I spoke to him, that was what I always called him. I always said

it just as I spoke to him then. When I entered the room and said 'Mul,' he was sitting about like Judge Bevers is there and he looked back towards me. I guess he saw me. I did not hear anything but 'son-of-a-bitch' and he kind of dropped his paper from him with his hand and reached back beside the table. I thought he reached under the table. When he reached under the table, I shot him one time."

In his cross-examination, appellant stated that he knew that Mulrein had been working at the courthouse for quite a while and that he would be found there; that he had sent friends to see Mulrein for the purpose of inducing him to refrain from further abuse and had received reports that unless he wanted to kill or be killed by Mulrein, he had better stay away from him.

There were prosecutions for felonies pending against the appellant and he had been informed that Mulrein had declared that he intended to assist in the prosecution.

Appellant had been in town all day and after dark had a conversation with his wife in which she told him she had gotten some money from the deceased and would get money from him again unless the appellant would give it to her; that deceased told her that she ought to get a divorce as the appellant was not good enough for her; He did not have the least suspicion and did not claim that there was any improper intimacy between the deceased and the wife of the appellant, but that the information received made him angry. He borrowed a shotgun which he said he first got for the purpose or hunting. After he drove to town he decided to go and see Mulrein. Appellant said further:

"When I saw him in there by the table I concluded to go and see him. My gun was not loaded then, but I loaded it as I walked to the door. When I got in there he was sitting by the table reading a newspaper. I got inside the door; but not on the inside of the office. * * * I don't know just what my position was whether nearer the center of the door or not. I guess I had my gun down by my side. I don't know how I was carrying the gun. * * * I guess I was six or eight feet from him. All that I heard him say was 'son-of-a-bitch,' and dropped his right hand. I did not see anything on the table. I did not see any pistol around there. I thought he put his hand under the table by the side. I had the shotgun in my right hand. I think I had the gun in both hands when I shot. He dropped his hand before I raised the gun. When I stepped in the door, he had a newspaper in a position as though he was reading it and I think he had it with both hands when I appeared there with the shotgun. I did not take aim at him when I fired. I did not shoot at the back of his head, I just shot, I threw up the gun and fired. When he dropped his hand, I thought he was after a gun. I shot Mulrein because I thought he was going to kill me. * * * I did not wait to see whether there were any drawers under the table or

not. * * * If he had not dropped his hand, I would not have shot him. * * * I did not appear there pleasantly, * * * but I spoke to him pleasantly. I was not in a good humor. I did not think my appearance there with a gun would cause him to make any demonstration, I just carried that gun for my own protection. I did not know that he would expect trouble if I went there with that double-barrel shotgun. I had been warned to stay away from Mulrein if I did not want to kill him or be killed. Mulrein was sitting down at the time I shot. I don't think his feet were on the table. * * * His feet nor legs were not upon the table. I guess he had that paper in his left hand when I shot, but I don't know. I figured that he had it in his left hand. As quick as I fired, I turned and walked out.

I am thirty-nine years old and weigh two hundred and forty pounds. I am strong and stout. I did not want to kill him. I had no thought of killing him. I just shot when he reached down. I shot at him. I did not shoot at the back of his head. I don't know whether he was reading that paper when I went in there or not. * * * I just went off and left him there that way without telling anybody.''

The sheriff reached the deceased a few moments after he was shot, and found him living but unconscious. The witness described what he saw. There was a large wound about four inches long and two or three inches wide. It entered under the right ear and extended down under the chin and removed a little of the chin bone on the right side. The wound was made with shots from a shotgun. There was a pool of blood near the table in the room, and a stream of blood on the floor between the table and the place where the deceased was leaning against a partition wall about thirty feet distant. There was also blood where the deceased was found. There was one shot found in the left leg of the deceased apparently ranging downward. In the partition wall, about twelve feet south of the chair there were six or seven shots. The chair was sitting in a line between these shots and the door. The shots extended down to the baseboard; some of them about two feet above it. Fragments of paper were found in the wall, as well as small pieces of paper between the chair and the wall. A newspaper with a number of shot-holes through it and blood upon it was also found about six feet from the back of the chair. The physical condition detailed by the sheriff were properly received. They tended to throw light upon the transaction and to reveal its nature. Cyc. of Law & Proc., Vol. 21, p. 938; Rocha v. State, 43 Texas Crim. Rep. 169; Thompson v. State, 33 Texas Crim. Rep. 217. The witness testified:

''That from the location of the chair in which the deceased was sitting at the time he was shot and from the location of the shot in a partition wall in which there was found blood, flesh and pieces of

paper, that the party who inflicted the wound was bound to have been behind the deceased and near the east side of the door that was directly behind the deceased at the time of the shooting.''

This was an unauthorized opinion and the objection which was urged against it should have been sustained. The relative position of the parties to the homicide was not a matter to be settled by the opinions of the witnesses. Williams v. State, 30 Texas Crim. App. 429; Blain v. State, 33 Texas Crim. Rep. 246; Pearson v. State, 56 Texas Crim. Rep. 612; Brown v. State, 55 Ark. 599; 18 S. W. Rep. 1052; Branch's Ann. Tex. P. C., Sec. 131.

Considering the testimony of Mr. Bryce, the sheriff, it remains only to be considered whether in the light of the facts before the jury, the error in admitting the testimony was harmful. If the improper evidence tended to solve no controverted issue against the appellant or if it was but cumulative of other like testimony received without objection, its receipt would not authorize a reversal of the judgment. Coyle v. State, 31 Texas Crim. Rep. 607; McCormick v. State, 52 Texas Crim. Rep. 496; Steagald v. State, 24 Texas Crim. Rep. 214; Wagner v. State, 53 Texas Crim. Rep. 306.

The only eyewitness was the appellant, and an analysis of his testimony fails to impress us with the view that there is any material conflict between the appellant's evidence and that embraced in the objectionable opinion testimony of the sheriff. The opinion was that the deceased was shot from behind. No other conclusion could be reached from the undisputed testimony describing the wounds and other physical conditions. Appellant's testimony, if we properly comprehend it, does not conflict with this theory but supports it.

The deceased was an unmarried man. He did some plumbing work outside, but was employed as janitor at the courthouse and made his headquarters there. At the time he was shot, he was sitting in a chair with a newspaper in his hand, under a light and at a table in the treasurer's office, where he generally stayed. This office was in the southwest corner of the courthouse. Appellant entered at the west door of the courthouse and was traveling east. Mulrein was south of him to his right. Appellant entered the door on his right going into the treasurer's office. There was a table about six feet long and extending north and south, about three or four feet from this door. The north end of the table was about three or four feet from the door and opposite this entrance. A light was swinging over the table, and there was a chair sitting under the light on the east side of the table and near it. One sitting in the chair would have had the light over and to the right of him. The back of the chair was slightly angling towards the door. It is obvious from this recital of the physical facts and appellant's admission that when the shot was fired he was standing in the door or near it and that the deceased was sitting in a chair by the table and leaves no question but that

the shot was fired from the rear of the deceased. The sheriff's testimony detailing the location and the character of the wound, the blood upon the floor and the range of the shots are but confirmatory of the appellant's testimony that when the shot was fired the deceased was sitting in a chair with a newspaper in his hand and that appellant was standing in the door which was in the rear of the deceased.

Doctor Winn reached the deceased five or ten minutes after he was shot. While he was still breathing, he was probably unconscious. The witness testified that he saw blood on the table and on the floor near the table, and a stream of blood on the floor from the chair to a place at which the deceased was found; that he observed imprints of shots which had entered the south partition wall, and a newspaper with blood upon it and holes shot through it.

The deceased was a spare man and weighed about one hundred and sixty pounds and was much older than the appellant. The back edge of the wound was immediately under the ear on the right side and tore that side of the neck, breaking the jaw-bone between the neck and the chin. The other end of the wound was a little left of the center of the neck. The wound was an inch or inch and a half up and down, and about three inches long and about three-fourths of an inch deep. It was a fatal wound. It did not necessarily immediately produce unconscious. The loss of blood killed the deceased. The entrance of the wound was clearly distinguishable from the exit by the smoothness at the point of entry and the ragged fragments at the point of exit. The witness used this expression:

"From the character of that wound, I say that the fire came from behind Mulrein."

One of the bill of exceptions is addressed to additional testimony of Doctor Winn, namely: that at the time deceased was shot he "was in an easy, normal or comfortable position," also this:

"On the character of the wound. If his head had been this way (indicating down and to the right), he evidently would have taken more of his jaw away, and the neck would have at least been partially obliterated. If the head had been this way, (indicating to the left and up), the shot would have not gone so far under the chin. If his head had been back or up it would not have hit his jaw-bone."

This testimony that deceased was in an easy, normal or comfortable position was not admissible. See Williams v. State, 30 Texas Crim. App. 429; Powdrill v. State, 62 Texas Crim. Rep. 442; Branch's Ann. Tex. P. C., Sec. 131. However, the court withdrew all the last quoted testimony and instructed the jury not to consider it. The rule touching the withdrawal of improper evidence is stated in Miller v. State, 31 Texas Crim. Rep. 636, and Deckard v. State, 88 Texas Crim. Rep., 132. Applying it to the instant case, the view is entertained that considered in the light of the other facts, the nature of the testimony was not such as precluded the correction of the error in admitting it.

On the facts, the case of Coyle v. State, 31 Texas Crim. Rep. 607, is much like the instant case.   Coyle shot and killed one Page.   A doctor testified for the State and said that "he was of the opinion, from the appearance of the wound and the clothing, that at the time the shot was fired, the right arm of the deceased was hanging at his side, slightly to the rear of a perpendicular line."   Judge Davidson, in writing the opinion affirming the case, states the facts in substance: In the evening preceding the homicide, hot words passed between Page and the appellant.   Page replied to the appellant in insulting epithets.   They were separated by friends.   Appellant was told by a mutual friend of his and of the deceased that the design was to kill him and the deceased was prepared to do so if he came to town.   Later a mutual friend endeavored to conciliate the parties and told the appellant that the deceased would apologize and sign the note from which the difficulty originated.   Coyle's testimony, quoted in the opinion, reads thus:

"After supper I took up my gun, and on the way to town loaded it, putting two cartridges in it.   I went with my gun to the drug store.   It was closed; no lights in it. · I saw a light from the back door of the saloon, and started there.   I went there.   I had no idea who was in there.   I did not expect to meet Page.   I supposed he had gone home.   I stepped into the door with both feet.   Heard some one say, 'Look out, Ben.'   I had my gun under my arm.   Without changing position, I said, 'Ben Page, you called me a son-of-a-bitch; I want you to apologize for it.'   His reply was by a shot from his pistol.   The ball struck me in the shoulder, making a slight wound. I then fired without raising my gun to my shoulder.   I had my gun cocked before I reached the saloon."

We quote the conclusion of the court thus:

"This evidence refutes the idea of self-defense, and constitutes the killing murder, at least of the second degree.   He provoked the difficulty, which he knew, or should have known, would end in the death of himself or of the deceased.   He knew deceased to be a dangerous man, and always went armed.   He approached and entered the house with his loaded gun cocked, and ready for immediate use, evidently with the purpose of using it if his demands were not complied with.   It was in a shooting position before he reached the door. Under this state of the case, it is wholly immaterial what was the position of the deceased's arm at the time defendant fired.   He made it necessary for Page to defend himself against a ready-cocked and presented gun.   The opinion of the witness, under such circumstances, could not have injured him.   Steagald v. The State, 24 Texas Ct. App. 207.   The State's evidence shows, by all the witnesses, that defendant entered the house with his gun cocked and presented, and said to deceased, 'Ben Page, you called me a son-of-a-bitch;' demanded no apology, but fired at once before deceased drew his

pistol, but as he was in the act of drawing it from his waistband, which act threw his right arm back of a perpendicular line, as was testified by one of the witnesses.''

It is true that one may seek another against whom he has a grievance, and the fact that he arms himself is not necessarily a provocation placing him in the wrong. Shannon v. State, 35 Texas Crim. Rep. 6; Branch's Crim. Law, Sec. 442. In the instant case, however, the long-standing enmity between the parties and the circumstances under which the appellant presented himself, and the time and place selected by him for the interview, were such as to bring him practically upon a parallel with the facts before the court in the case of Coyle v. State, supra, in which this court held that the facts were such as repelled the idea of self-defense. In the instant case the court submitted the issue of self-defense to the jury. Obviously, if the deceased made any demonstration, it was responsive to the conduct of the appellant. At the time that appellant appeared, the deceased was sitting alone in his office and quietly reading a newspaper. This the appellant knew. If in fact, acting upon the manner, the conduct, the words and the circumstances under which the appellant appeared, the deceased made a demonstration, the jury was permitted, in an appropriate charge of the court, to determine whether the appellant's conduct was reasonably calculated to provoke the demonstration and whether it was provoked in order to furnish a pretext for killing the deceased. In deciding the issue, the jury was not restricted to the words of the appellant, but the antecedent relation of the appellant and deceased and the circumstances immediately attending the tragedy were to be taken into account. Tate v. State, 33 S. W. Rep. 121; Hollman v. State, 87 Texas Crim. Rep., 576. The presence of the issue of self-defense is not so clear as to render incurable the evidence of Doctor Winn improperly received. The testimony of the sheriff complained of but revealed the obvious fact, which was undisputed, that the deceased was shot from behind and this was proved, moreover, by other testimony admitted without objection. If the issue of self-defense was in the case, it was qualified by the issue of provoking the difficulty. There was no error in submitting the law of provoking the difficulty.

When the special venire was exhausted, it was proper for the court to authorize the sheriff to summon talesmen and he did not err in refusing appellant's motion to call the men from the venire for the week. Code of Crim. Proc., Art. 667; Weathersby v. State, 29 Texas Crim. App. 278; Mays v. State, 50 Texas Crim. Rep. 165; Williams v. State, 60 Texas Crim. Rep. 453. Eleven jurors had been selected when the special venire list was exhausted. Two peremptory challenges remained for the appellant.

Appellant filed a motion to disqualify the sheriff from summoning talesmen. In support of the motion, the sheriff was called as a wit-

ness and disclaimed any prejudice or interest in the case and stated that he had no recollection of having made any remark to the effect that he would have summoned jurors favorable to the State; that if any such remark had been made, it was jocular and not serious; and that he acted with entire impartiality in summoning the men who appeared as talesmen. Appellant challenged the array so far as the talesmen summoned affected it, and upon this the sheriff also testified. No other evidence was adduced. We are not prepared to say that the trial court was not warranted, upon the evidence produced, in overruling the motion. There was but one juror to select. The talesmen summoned, so far as the record reveals, were eligible in every respect. But seven were summoned, of which two were stricken by the State. The only facts relied upon by the appellant is the admission by the sheriff that he had given State's counsel the benefit of his judgment as to the men on the venire list and that he stated that he conceived it to be his duty to work for the State.

A second or subsequent application for a continuance was made to secure the testimony to the effect that the deceased had made threats to kill the appellant and that this had been communicated to him. There was diligence with reference to but one of the witnesses, and he would have testified, according to the averments of the motion, that the deceased had said that he "was going to send the appellant to the penitentiary or to hell." While not this remark, others of a similar nature and many of them, were proved upon the trial, both from the witnesses of the appellant and of the State. The bitter feeling between the appellant and the deceased, the fact that the deceased was threatening to interpose and aid in the prosecutions which were then pending against the appellant, the fact that he said that he would be glad if the appellant was hung, that he used bitter and abusive language towards the appellant on many occasions was undisputed; and in view of this condition and the other facts in the record, we think the trial court did not abuse its discretion in concluding that the testimony of the absent witness on another trial would not produce a different result.

Other questions raised have been considered. They relate in part to evidence which is cumulative on an uncontroverted issue, and in part to self-serving declarations of the appellant.

No error has been presented or perceived which, in the opinion of this court, demands a reversal of the judgment. It is therefore affirmed.

*Affirmed.*

ON REHEARING.

June 27, 1923.

LATTIMORE, JUDGE.—That deceased was intensely hostile toward appellant appears in the record without dispute, and that he had made

threats to do him all sorts of harm, extending from sending him to hell or to the penitentiary down to getting even with him, also appears without dispute. These threats were both communicated and uncommunicated. We think our former opinion correct in holding it not error to refuse a third application for continuance to procure witnesses to testify to threats and abusive language. It seems well settled that where a proposition involved in a case has been supported by abundant testimony and is in nowise controverted, that it is not an abuse of the discretion confided in the trial judge to deny a new trial sought in part upon the refusal of a continuance to secure absent witnesses to give testimony substantially cumulative of the facts testified to before the jury. All of our decisions are to the effect that unless it appears reasonably sure that the absent testimony would have brought about a different result, it is not error to refuse the new trial.

From all the testimony in this case,—that of sheriff Brice, that of Dr. Winn and of appellant himself,—it would appear reasonably certain that the shot fired by appellant was from the rear or nearly so, of deceased. Much of the testimony on this point is set out in the original opinion in discussing appellant's bill of exceptions No. 6, which presents complaint that sheriff Brice was allowed to testify in substance that from the location of the chair in which deceased was sitting, and of the flesh, paper and shot holes in the wall beyond deceased, that the person shooting was bound to have been behind deceased and near the west side of the door. The position of the chair with its back toward the door was in testimony. The fact of the shot holes in the walls south of said chair, in which shot holes were bits of flesh and paper, and the fact that the door was north from said chair, were all in testimony and not controverted. The sheriff had testified without seeming objection that a line drawn from the shot holes, etc., in the wall past the chair would go near the west side of the door in which appellant admitted himself to be standing at the time he fired the fatal shot. On original presentation we held this statement of the sheriff to be an opinion and that it should not have been admitted, but we could not bring ourselves to believe that it was a hurtful opinion inasmuch as it seemed to coincide so entirely with the other facts. We find nothing in appellant's testimony which in any way suggests that when he shot deceased he was not behind him but on the contrary we observe that he testified when he stepped up to the door of the room in which deceased was sitting reading and spoke to him, that deceased "looked back at him;" nor does the testimony of appellant that when deceased saw him he dropped his hand toward the table by which he was sitting, justify the conclusion that this is any way placed deceased in a strained, abnormal or uncomfortable position. Appellant said that deceased was sitting in said chair when he fired, and and that after he fired and until he

walked away from the door deceased remained sitting in the chair. The mere fact of dropping his hand toward a table or under the table did not apparently, according to the testimony of appellant himself, change the position of the body of deceased. These facts being true, we think it correctly held in the original opinion that the testimony of Dr. Winn as to the fact that from the character of the wound that went through the neck, jaw and chin of deceased, he was in a normal, easy and comfortable position when shot, should not reverse the case. We are required by the statute to famaliarize ourselves with the statement of facts in every case and are justified in trying to ascertain the possible injury of matters complained of in a bill of exceptions, in resorting to what appears otherwise in the record. Dr. Winn had given a demonstration to the jury by moving his head from one side to the other and holding it up and backwards, etc., of what could not have been the position of the head of deceased at the time of the shooting. The jury could see these matters of demonstration to an extent which can not be fully set out in the statement of facts. The doctor was a physician of experience and would appear to have been trying to reproduce as nearly as he could to the jury the impression that was made upon his mind by an examination of the wounds in the head and neck of deceased. While we did say in the original opinion that this statement was such an opinion as should not have been allowed, still said testimony was not far removed from the rule laid down by many authorities in this State that when one is attempting to reproduce an effect produced on his mind by a situation which can not be reproduced or made palpable in the concrete, that he may give his opinion. See Branch's Annotated P. C., Sec. 131 for collation of authorities. The language used by the doctor in expressing the impression produced on his mind by what he saw, may be complained at as going too far, but as stated by us already, it would not seem to be contradictory to any testimony given on behalf of the accused. It would appear that one versed in anatomy might easily tell from an examination of a wound which had penetrated muscles of the body, that said muscles were strained or relaxed; that they were bent or pulled to one side or the other, or like testimony. It would not appear to us to be an erorr for which a case should be reversed, that the language selected by the witness in which to express his opinion might be such as would justify complaint, unless it also appeared that the language used or the statement made was susceptible of harmful effect. Judge Hurt in Steagald v. State, 24 Texas Crim. App. 213, passed upon a much less admissible opinion and announced a rule seemingly applicable as follows:

"Upon the trial the State propounded this question to Doctor Ferris: 'What in your opinion, from the examination you made of the body, as to how the injuries you saw, to wit, the arm broken, the neck broken and the skull crushed was done?' This question was

objected to by appellant, because 'it called for the opinion of the witness as an individual, and not as an expert; was mere speculation on the part of the witness, and was matter about which the jury were as competent to judge as the witness.' The objection being overruled, the witness answered: 'I am of opinion that the only way it could have been done, or the only way I can imagine, is that the party put the infant on its face and placed his boot heel on the back of the head, and caught hold of the right arm and pulled it, and stamped on the back of the head, crushing the skull and breaking the neck and arm.' 'Witness Ferris also stated that this opinion was not as an expert, but as individual, and the injuries might have been inflicted in many other ways.'

The objection should have been sustained upon the grounds urged. Incompetent, however, as it clearly was, did the opinion of the witness, as to the manner in which the injuries were inflicted, operate to the injury of appellant's rights? Do the facts stated in the opinion of the witness tend to establish the corpus delicti. That is to say, that the child met its death, after being born alive, at the hands of some person by violence? They certainly do; but was not this completely and conclusively established by competent evidence, independent of Doctor Ferris's opinion. * * *

Now, we believe that if it be possible to establish any fact conclusively, the fact of the corpus delicti, that is, that the child was born alive and came to its death by violence, this fact is so established in this case. And, conceding that the opinion of Doctor Ferris tended to prove the corpus delicti, since there could not be a rational doubt as to this, the opinion could not have injured appellant's rights.''

There appears no error in the admission of testimony of the fact that early the next morning after the homicide a witness found three new 12-guage shotgun shells near a telephone post in front of a store where it is shown by other testimony appellant had passed along the preceding night, and after the shooting. Appellant used a 12-guage shotgun in killing deceased. He claimed that when he drove his car up near the court house just before the shooting, he got one shell out of his hunting coat pocket in the car and loaded the gun before going to the court house where deceased was. The shooting occurred about 9 or 10 o'clock at night. The shells were found about 7 o'clock the next morning. The finding of the new shells of the size used by appellant, and at a place where he had passed along on the night of the homicide, might be taken as a circumstance showing him to have been in possession of more shells than the one placed in his gun, and thus may have weight in determining his deadly purpose in going to the courthouse.

Nor have we been able to conclude in the face of all the testimony that the court erred in submitting the law of provoking a difficulty. Whether appellant was an avowed enemy of deceased or not, he knew, according to his own testimony, that deceased entertained

95 T. C.—6

bitter enmity toward him. According to the defensive testimony the wife of appellant told him a few moments before the killing that deceased had let her have money and thereupon appellant left and went at once to where deceased was, taking a shot-gun with him which he loaded after getting out of his car near the courthouse. Appellant admits that he was mad. He saw deceased sitting inside his own office reading. He admits that he took his gun, loaded it, walked into the courthouse, went to the door of the office of deceased, said "Mul" and almost immediately shot deceased who was sitting in the chair, and who never got up or attempted to get up from the chair, or made any move to advance upon appellant, the only things attributed to deceased by appellant himself being that he said, "You son-of-a-bitch," and dropped his hand toward or under a common table about three feet high near which deceased was sitting. Appellant saw no weapon on the table, under the table, in or near the hands of deceased; in fact it was shown there was no weapon about the table, though this fact was not known to appellant. The paper which deceased was reading was not even dropped, but was shot full of holes. The left leg of deceased was penetrated by one shot which ranged downward, a most significant fact in view of the testimony of witnesses who had been to the office of deceased shortly before the shooting and said that he was sitting in a chair reading with one or both feet up against the table. Appellant said he went to the court house to get deceased to desist from his abuse of him. This may have been true but his choice of a time to go, his going alone, armed, mad,—were very unfortunate. His conduct immediately after the shooting in fleeing from the court house as told by sheriff Brice, his act in putting the recently discharged gun in his father's room, his return to the immediate vicinity of the homicide, his remarks and conduct while there, —all doubtless had weight with the jury in determining their solution of the case against him.

Believing a correct conclusion was reached by us in our original opinion, the motion for rehearing will be overruled.

*Overruled.*