# OCTOBER, 1925.

## JOE BROWN v. THE STATE.

No. 8504.   Delivered Oct. 22, 1924.

Rehearing denied June 10, 1925.

1.—Murder—Motion for New Trial—Postponement of Hearing—Properly Refused.

Where appellant requests a postponement of the hearing of his motion for a new trial, on account of the absence of a witness whom he desired to use on such hearing, no error is presented in a refusal of such postponement where the testimony expected of such witness does not relate to any newly discovered matter, and hence nothing which might have been verified by the witness to appellant's benefit.

2.—Same—Evidence—Testimony of Defendant—Given on Examining Trial—Admissible.

Where on the examining trial the accused made no statement such as is contemplated by Arts. 294 and 295 C. C. P. but took the witness stand in his own behalf, and testified as a witness under oath, his testimony, so given may be reproduced against him, on the final trial, whether he is warned or not.   Following Dill v. State, and other cases cited.

3.—Same—Evidence—Opinion and Hearsay—Properly Excluded.

Where the court refused to permit the witness Dupslaus to testify that one Robinson had told him, that if Joe Brown (appellant) didn't watch out Frank (deceased) would kill him, no error is presented.   Such testimony was hearsay, and the opinion of Robinson, and not being admissible as original testimony if offered by Robinson, it could not be admissible as a predicate to impeach him.   See authorities collated under See 175, Branch's Ann. P. C.

4.—Same—Bill of Exceptions—Not Comprehensive—No Error Presented.

Where a bill of exception merely complains of the refusal of the court to permit appellant's wife to testify that she heard Robinson tell appellant of threats deceased had made against him.   What was claimed to have been heard by appellant's wife is not shown.   A bare statement in the bill that it was threats, is too indefinite to enable us to pass intelligently on the force of the complaint.   See sec. 207 Branch's Ann. P. C. and authorities collated thereunder.

5.—Same—Continued.

And so the bill complaining of the refusal of the court to permit appellant's wife to testify as to the witness Robinson coming to their home with a gun, and as to statements made by him there, relative to deceased and as to the effect of what deceased had said on the actions of said Robinson.

6.—Same—Continued.

The bill complains of a multiplicity of things, some of which seem to be entirely immaterial, others involve hearsay statements of Robinson which appear to be only hearsay statements of his opinion.   While this court has always been liberal in construing bills of exception where the death penalty has been assessed, we are unable to discover any error in the bill under discussion, as it is presented to us.

**7.—Same—Impeachment of Witness—Proper Predicate.**

While a witness may be impeached by the opposite party as to any material matter, it is first necessary that a proper predicate be laid, and unless such predicate is laid by the witness sought to be impeached, the impeaching testimony is not admissible.

**8.—Same—Evidence—Immaterial—Properly Excluded.**

We find no error in the exclusion of the testimony of witness Dupslaus, that deceased had stolen from witness various articles, and that he had sent word by defendant to deceased that he must refrain from such depredations, that this enraged the deceased and that he thereupon threatened witness and defendant. This witness had testified that he had never heard deceased threaten appellant, but had heard appellant many times threaten to kill deceased.

**9.—Same—Evidence Sufficient—Death Penalty.**

While appellant was given the extreme penalty of death, the evidence amply sustains such a verdict. The sworn testimony of appellant, given on the examining trial was introduced, and presents a deliberate, premeditated, malicious assassination, without the slightest evidence of mitigation coming from appellant himself, and finding no error in the record, the cause is affirmed.

ON REHEARING.

**10.—Same—Evidence—Exclusion of—Harmless.**

In his motion for rehearing appellant insists that his wife should have been permitted to testify that she heard Dupslaus tell appellant that deceased had threatened his life. The bill of exception presenting this matter is inaccurately drawn, but when considered, presents no error.

**11.—Same—Continued.**

Appellant himself, testified in his own behalf on his trial, and nowhere in his testimony is found the statement that Dupslaus had told him in his wife's presence that deceased had threatened his life. The issue of self-defense, is of so flimsy a character that the trial judge would have been warranted in refusing to charge on it. From no conceivable viewpoint could the exclusion of the wife's testimony complained of, have injured appellant, and his motion for rehearing is overruled.

Appeal from the Criminal District Court of Harris County. Tried below before the Hon. C. W. Robinson, Judge.

Appeal from a conviction of murder. Penalty assessed at death. .
The opinion states the case.

*Fuller & Fuller,* for appellant.

*Tom Garrard,* State's Attorney, and *Grover C. Morris,* Assistant State's Attorney, for the State.

HAWKINS, JUDGE.—Appellant is condemned to suffer the death penalty for the murder of Frank Armstead.

There are six bills of exception in the record. They will not be discussed in the order they appear, but the sixth bill will be first considered. In the motion for new trial appellant assigns error in several particulars relative to the court's action with respect to the examination of the witness Dupslaus. He made application for postponement of the hearing of his motion for new trial because of the absence of said Dupslaus by whom appellant says he expects to prove the matters set up in the motion relative to said witness. Assuming diligence sufficient, we have been unable to ascertain in what way the presence of the witness could have aided appellant upon his motion. There is no matter set up therein claimed to have been newly discovered, hence nothing which might have been verified by the witness to appellant's benefit. All matters relative to the examination of the witness urged as erroneous in the motion are contained in other bills.

We observe no impropriety in admitting in evidence at the State's instance excerpts from the testimony of appellant given at the examining trial as complained of in bill number five. The bill does not contain the testimony thus admitted and might be dismissed from further consideration for that defect. (See authorities collated under Sec. 210, p. 135, Branch's Ann. P. C.). It appears that one of the objections urged was that accused had not been warned as required by law at the time the statements introduced against him were made. The court's explanation reveals that at the examining trial appellant made no statement such as is contemplated by Articles 294 and 295, Code of Criminal Procedure, but that in due order of procedure he took the witness stand in his own behalf, and it was testimony thus given by him that was introduced against him on this trial. It is well settled that if a defendant takes the stand and testifies under oath as a witness in his own behalf on his examining trial his testimony may be reproduced against him on the final trial whether he was warned or not. Dill v. State, 35 Texas Crim. Rep. 240; Kirkpatrick v. State, 57 Texas Crim. Rep. 17, 121 S. W. 511; Pierce v. State, 90 Texas Crim. Rep. 302, 234 S. W. 537.

It is made to appear by bill of exception number two that appellant offered to prove by Dupslaus that one Robinson had told Dupslaus that if Joe Brown (appellant) didn't watch out Frank (deceased) would kill him. This was excluded upon objection that it stated an opinion and conclusion of the witness. It will be observed that it was not an inquiry of Robinson as to what, if anything, he told accused, but was an inquiry if one witness had not expressed to another an opinion as to probability of deceased killing accused. Robinson himself would not have been permitted to testify to such an opinion expressed to Dupslaus, and much more objectionable was the effort to supply Robinson's opinion by the hearsay evidence of Dupslaus. The court explains the bill by stating that

it was an effort to impeach Robinson and that the question to Dupslaus was held objectionable because no proper predicate had been laid' when Robinson was testifying. In any event the bill presents no error. If the purpose of the inquiry · was impeachment, the bill shows it was relative to an opinion which could not have been testified to by Robinson himself and therefore was immaterial. (See authorities collated under Section 175, Branch's Ann. P. C.)

We learn from bill number three that appellant offered to prove by his wife that she heard Tom Robinson tell appellant "of threats" deceased had made against appellant. Objection was interposed by the State because the proper predicate had not been laid to authorize admission of such evidence. The learned trial judge appears to have adopted this view, and explains the bill by the statement that the witness Robinson was still in attendance on court and if accused desired to impeach Robinson he could have recalled him to the witness stand and have laid the proper predicate which he did not do. Appellant contends that it was not necessary to lay any predicate, the proffered evidence being admissible to. show communicated threats. If the purpose was to show that threats of a material character claimed to have been made by deceased against accused had been communicated to him it was not essential that the fact of communication by shown by the party claimed to have heard the threat, but proof in such manner that the threat was actually made would be obnoxious to the rule against hearsay evidence. Holt v. State, 94 Texas Crim. Rep. 46, 249 S. W. 481; Wharton's Crim. Ev., Vol. 1, Sec. 257, Morgan v. State, 54 Texas Crim. Rep. 546. However, the record shows that no charge upon· communicated threats was given nor requested, and no exception reserved because of its omission. We learn from the statement of facts that the witness Robinson testified that he had never heard deceased make threats to kill appellant, and the nearest approach to a threat by deceased testified to by said witness was that he had heard deceased say if appellant "didn't quit writing notes to his house him and Joe (appellant) were going to have trouble." The witness positively asserts that he never at any time communicated this statement to accused. If the bill was intended to cover proof of the communication of this statement it does not reveal it. We regret that the bill is too general to advise us of the matter complained of. It simply states that appellant's wife would have sworn that she heard Robinson tell appellant "of threats" deceased had made. What was claimed to have been heard by appellant's wife is not shown. A bare statement in the bill that it was "threats" is too indefinite. What she would term a "threat" might turn out to be something of the most trivial character, and without being advised as to the language used which is construed to be a threat we cannot appraise the force of he complaint. (See

Sec. 207, Branch's Ann. P. C., and authorities collated thereunder.)

Bill number four recites that appellant's wife was not permitted to testify as to the witness Robinson coming to their home with a gun, and as to statements made by him while there relative to deceased, and as to the effect of what deceased had said on the actions of said Robinson. In cases where the death penalty has been assessed this court has always been liberal in construing bills of exception to the end that no injustice be done accused, but the bill now under consideration complains of a multiplicity of things. Some of the matters sought to be shown by appellant's wife seem to be entirely immaterial, others involve hearsay statements of Robinson which appear to be only expressions of his opinion, and the only tangible thing in the bill as it appears to us is a statement that witness would have sworn that Robinson told her in appellant's presence that deceased "had threatened the life of defendant." This involves the same principle discussed relative to bill number three in that the language claimed to have been used by Robinson construed as a threat is not set out in the bill. It is not stated for what purpose the rejected evidence was offered. We might gather it by inference from the statement in the bill that the witness Robinson had become hostile to accused since the homicide and for that reason accused "could not afford to use said Robinson as his witness." It does appear from the statement of facts that Robinson was interrogated on cross-examination by appellant relative to the matters mentioned in the bill and his evidence was unfavorable to accused. We would be justified therefore in drawing the inference that the real effect if not the purpose of the inquiry to accused's wife was to supply through her evidence which accused had expected from Robinson but which the latter declined to give. Evidence could not be thus supplied. (Bryan v. State, 90 Texas Crim. Rep. 175, 234 S. W. 83, and authorities therein cited.) The learned trial judge and State's counsel conceived the purpose of the proffered evidence to be for impeachment of Robinson. Objection was made by the State and sustained because no proper predicate had been laid. It appears from the judge's explanation that Robinson had already testified when accused's wife offered to testify upon the matters suggested in the bill, and that when her evidence was excluded in the absence of a proper predicate appellant did not recall Robinson to lay same although he was still in attendance upon court. If the matters inquired about were proper subjects for impeachment we would still be bound by the court's qualification that proper predicate therefor had not been laid.

Bill number one recites that appellant asked the witness Dupslaus if he had "lost any property around his place," and offered to follow it up and show its relevancy; that witness would have testified

if permitted that deceased had stolen from witness various articles, and that he sent word by defendant to deceased that he must refrain from such depredations; that this enraged deceased and that he thereupon threatened witness, and also threatened the life of defendant. The bill is qualified by a statement from the court that the witness Dupslaus had testified in the examining trial and before the court upon habeas corpus that all the information he had relative to deceased stealing witness's property was hearsay and based upon statements made by defendant. If witness would have sworn to the things recited in the bill his former statements made on examining trial and habeas corpus would have been available to the state for the purpose of affecting his credit, but is would furnish no grounds for excluding the proffered testimony if material. That a fight had occurred between appellant and deceased some six weeks prior to the killing seems to be undisputed, but the details that led up to this fight appear immaterial under the facts disclosed from the record as will later appear. The bill is further subject to criticism in that it fails to show what language was attributed to deceased as conveying a threat against accused. The necessity for the bill to be more specific upon this point becomes apparent from an examination of Dupslaus's evidence in the record. He was placed upon the witness stand by appellant himself and upon direct examination and in response to appellant's counsel testified that he never had a conversation with deceased in which the latter made any remarks or any threats against appellant. He said there were hard feelings between deceased and appellant, but that he knew this only from what appellant had told him. On cross-examination the witness stated that he had heard appellant say he was going to kill deceased, and that appellant had tried to borrow a gun from witness for that purpose. It therefore appears that the recitals in the bill as to what the witness would have sworn as to threats is in direct conflict with what he in fact did swear, and in the absence from the bill of the language construed to be a threat from deceased we are left to surmise and inference only.

Just how the proof of any kind of threats even the most violent from deceased could have availed appellant is not apparent from the record. The parties lived some eight miles from each other. Four or five weeks prior to the homicide appellant was at deceased's home where a fight between them occurred. A State's witness who saw part of the fight says after it was over both of them went in deceased's house and remained for more than an hour; that when appellant started to leave deceased said "I will be up there tomorrow. Everything is well now, ain't it?" to which appellant replied, "I will see you again." Appellant's version of the fight is much at variance from that given by the State's witness, but

the details are not here related being deemed immaterial. The record contains many threats to kill deceased made by appellant between the time of this fight and the homicide. He made several efforts to borrow a gun for the purpose but was unsuccessful. About a week before the killing he bought a shotgun and some shells; discovering that the shells were not the proper size to fit the gun, on the very day preceding the killing at night he procured a boy to secure some which would fit it. He took his gun apart, wrapped it in a sack, tied it on his saddle, mounted his horse and ostensibly started to the store, but in ·fact bound for the home of deceased seven miles away. He left his horse some five hundred yards from the house and approached it on foot going in the back way. A party was in progress not far from the home of deceased, and Mary Moore, his cousin, who lived with deceased and his wife, had just finished dressing preparatory to attending the party. A lighted lamp was in the room. Deceased came into the room where she was and asked for some toilet article. Somewhere between his home and deceased's appellant had assembled his shotgun and at this moment he fired through the closed window striking deceased in the back and side, some of the shot also hitting Mary Moore. Deceased died almost instantly. The window had no shade but a thin curtain which was down; the shot came through the window breaking it, and through the curtain. Appellant fled into the darkness, but on reaching his home told parties there he had killed "the bastard" and would do anybody the same way who reported it. Appellant testified on the trial that after passing the store he concluded he wanted to attend the party but was afraid to go if deceased was going to be there, and that he went to deceased's house to ascertain whether he was getting ready to attend the party; that just as he (appellant) approached the window deceased looked through the window and curtain, saw appellant, "turned and reached around the dresser after his gun" whereupon appellant fired believing his life was in danger. In one breath appellant swears that deceased looked through the window and "curtain", and in the next denies that the window had any curtain or covering of any kind. The State identified and introduced in evidence the curtain showing the hole made by the charge of shot. The State also proved by Mary Moore that deceased had no gun of any kind in the room and that he made no such movement as claimed by appellant. The State introduced the sworn testimony of appellant given at the examining trial as follows:

"He (Frank) was standing there. I don't know what he was doing. He has his side to me. He had his right side to me. When I saw him I said I better kill you now or you will kill me and I threw the gun up and shot him. He didn't see me. He didn't know who shot him. I don't think he knew what happened to him.

I shot him and he wasn't doing anything to me at that time. I went there to kill him. I made up my mind after I started over to Barker to the store. I didn't have it in my mind to kill him when I left home. I made up my mind after I started over to Barker to the store. I carried out what I intended to do. When I killed him he didn't see me."

Out of an abundance of caution (which is recommended to all trial judges), and in deference to the testimony of appellant the learned trial judge gave a charge on self-defense. This court would have been loath to reverse in its absence under the record. The appearance of appellant at the window of deceased's house in the night time armed with a deadly weapon after repeated threats to kill him, would have justified any act on deceased's part for his own protection had he been aware of appellant's presence. Beck v. State, 85 Texas Crim. Rep. 578, 213 S. W. 662; Coyle v. State, 31 Texas Crim. Rep. 607, Bennett v. State, 95 Texas Crim. Rep. 70, —— S. W. ——. The whole record refutes the idea of self defense, and leaves no doubt in our mind that appellant spoke the truth in the examining trial when he said "He didn't know who shot him. When I killed him he didn't see me."

Believing the facts disclose a case meriting the extreme penalty inflicted, and that no errors occurred during the trial justifying a reversal, the judgment is affirmed.

*Affirmed.*

### ON MOTION FOR REHEARING.

LATTIMORE, JUDGE.—Practically appellant's only complaint of our original opinion is that we did not hold the matters set up in bill of exceptions No. 4 to show reversible error, and the particular insistence is that appellant's wife should have been permitted to testify that witness Robinson told her in appellant's presence that deceased "had threatened the life of the defendant". The bill is full of many inconsistent statements and ordinarily consideration thereof would have been refused because of the manner of the preparation of the bill, but in death penalty cases we try to extend the rules as much as possible and consider complaints which we otherwise would not. It is perfectly plain that to say a statement was made in the presence of another, is not sufficient unless it go further and either in terms or by explanatory averment show that such statement was heard or reasonably should have been heard, by such other. Appellant took the witness stand in his own behalf, and while he testified to threats made by deceased and to communication thereof by other people, he nowhere claimed to have heard witness Robinson state to appellant's wife in his presence, that he had heard deceased threaten to take his, appellant's life.

Even if it be then conceded that the trial court should have permitted appellant's wife to make the statement referred to, the rejection of which is complained of, her statement of same could in nowise affect appellant's rights in the matter of the homicide, and would seem so little likely of having affected the verdict as that we are forced to conclude its rejection of no possible harm to appellant. If she had testified that Robinson stated to her in appellant's presence that he had heard deceased threaten appellant's life, unless said statement was heard by appellant or was brought home to him in some way, it could have added nothing to appellant's right of self-defense. We have said this much for fear that we might be understood as having meant in our original opinion that a witness could not give testimony of a statement made in the presence and hearing of the accused which if heard by him and acted upon, or which might have been considered as influencing the subsequent actions of the deceased, might thus have become material and admissible.

Believing that in the matter referred to, no possible harm could have resulted to appellant, and that the record wholly fails to show that the remark was heard by him, or that he relied on same, or believed it true, or that it influenced him in any way in committing the homicide, the motion for rehearing will be overruled.

*Overruled.*